670 F.Supp. 861 (1987)
Howard A. FROMSON, Plaintiff,
v.
WESTERN LITHO PLATE AND SUPPLY COMPANY and Bemis Company, Inc., Defendants.
No. 82-354C(6).
United States District Court, E.D. Missouri, E.D.
September 30, 1987.
*862 Charles L. Merz, Padberg, McSweeney, Slater & Merz, St. Louis, Mo., John E. Lynch, Alfred H. Hemingway, Jr., Felfe & Lynch, New York City, for plaintiff.
John K. Roedel, Jr., Senniger, Powers, Leavitt & Roedel, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
GUNN, District Judge.
This patent infringement case was tried to the Court sitting without a jury between February 17 and March 5, 1987. The Court, having considered the pleadings, the evidence and testimony adduced at trial, the briefs of the parties and the applicable law, now enters judgment in favor of plaintiff and makes the following findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.Pro.

FINDINGS OF FACT
Plaintiff Howard A. Fromson is an individual residing in Weston, Connecticut. He is the inventor and sole owner of United States Letters Patent No. 3,181,461 (the '461 patent) issued to him on May 4, 1965 upon application filed May 10, 1963. Fromson is also a founder and principal of Ano-Coil Corporation, a Connecticut corporation with its principal place of business in Rockville, Connecticut. Ano-Coil manufactures anodized aluminum. It also manufactures lithographic printing plates comprising an anodized aluminum substrate.
Defendant Western Litho Plate and Supply Company (Western) is a Missouri corporation with its principal place of business in St. Louis, Missouri.[1] Western manufactures and supplies lithographic plates, chemicals for making and using lithographic plates and plate-processing equipment. It has been engaged in the production and sale of lithographic plates since the 1950's.
The '461 patent by its terms "relates to a photographic plate for use in planographic printing and the method of making the same." In planographic printing, as opposed to raised letterpress or engraved printing, image and background are in a single plane on the printing plate surface and lithographic processes are employed to duplicate the image.
*863 Lithographic printing is an old art based on the premise that oil and water do not mix. The image area of a lithographic plate attracts grease-based ink and repels water while the background area attracts water and repels ink. Successive treatments of the plate with water and ink cause ink to adhere to the image area of the plate. When the plate is run through a press the ink is in turn transferred to a print medium, resulting in a printed image.
Photolithographic plates such as those manufactured by Fromson and Western utilize a photographic process to form image and background areas. The image area is created on a substrate by exposing a photosensitive coating to light through a negative. Development of the plate causes retention of the coating on the plate solely in the image area. Photolithographic plates are sold both pre-sensitized  that is, already coated with photo-sensitive material and as "wipe-on" plates.
Aluminum, which had been recognized as a plate material since 1894, gained wide commercial acceptance as a photo lithographic substrate in the 1950's after issuance of United States Letters Patent No. 2,714,006 (the Jewett patent) on July 26, 1955. The Jewett patent summarizes developments in the art prior to the '461 patent. The Jewett patent teaches the preparation of a lithographic plate by cleaning an aluminum surface, removing the resultant scum by treatment with 70% nitric acid, applying an alkali metal silicate and then treating the surface with a light-sensitive diazo resin. Prior to the Jewett patent, aluminum had not gained commercial acceptance because of problems with the adherence of diazo to aluminum. The significant advance embodied in the Jewett patent consists of its teaching of silication of the substrate, which promotes adherence of diazo and creates a more stable, longer-running photolithographic plate.
Aluminum when exposed to the atmosphere develops an atmospheric or "natural oxide" coating, approximately fifty to one hundred angstroms in thickness. Means of strengthening aluminum through the creation of a thicker oxide coating include anodization, in which an oxide coating of approximately one micron or more may be formed by applying an electrical current through electrodes to aluminum metal in an electrolyte bath.
In the 1950's Fromson was engaged in the business of selling metals and began, through Ano-Coil Corporation, to sell anodized aluminum for use in the manufacture of television antennas, furniture tubing and nameplates. In manufacturing anodized aluminum Fromson utilized the then-recent process of continuous coil anodization, a more efficient and economical process than labor-intensive batch anodization. Fromson had no background in lithography, but in seeking new markets for his anodized aluminum product he discussed its amenability to lithographic uses with Kalle and Azoplate, two aluminum plate suppliers. Both companies found Fromson's samples unsuitable for lithography.
Fromson continued to experiment on his own to find a means of utilizing his anodized aluminum product in the manufacture of lithographic plates. He found that treatment of anodized aluminum with sodium silicate yielded a printing plate with the desirable properties of corrosion and abrasion resistance and long press life. He filed for patent protection and, after initial rejection, his patent was allowed.
At the time of his invention Fromson was not in a position to manufacture and market lithographic plates. He had neither the facilities for producing them nor the familiarity with the market successfully to enter the field. His activity in the lithographic market was therefore limited until the mid-1970's to offering anodized and silicated aluminum in bulk to plate makers. His principal, if not sole, customer in the mid-1960's was S.D. Warren Co. (Warren), which initially placed larger orders with Fromson for anodized and dyed substrate (the Fotogold plate), out of fear of infringement of the Jewett patent by use of the silicated product.
In 1969 Warren began purchasing the anodized and silicated coil product, and subsequently 3M, Dupont and the Rogers Corporation also purchased anodized and silicated *864 coil from Fromson. The plates produced by these customers were generally used in the commercial printing market, in which anodized and silicated plate sales represent only about 5% of total lithographic plate sales. Fromson did not attempt to enter the metro newspaper market until 1977 and did not have an effective marketing organization until 1979 or 1980. By that time an extensive newspaper market for lithographic plates had been created by Western and others. By virtue of the low production costs associated with his coil anodizing process, Fromson was rapidly able to achieve a substantial share of that market.
Prior to 1974 Warren acquired a scanning electron microscope capable of magnifying surface details of product samples. Late in 1974 Warren obtained an x-ray probe for the microscope that enabled it to permit analysis of the composition of product samples. X-ray probes of sample anodized aluminum plates from Western, Advance Offset Plate, Polychrome, Richardson and others revealed heavy concentrations of silicon, suggesting infringement of the '461 patent.
In March 1979 Fromson filed for reissue in the Patent and Trademark Office (PTO). The reissue proceeding provided an opportunity for infringers to challenge the validity of the '461 patent by submitting prior art, evidentiary facts, authorities and argument to the PTO. Western, Imperial Metal & Chemical Co., E.I. duPont de Nemours & Co. and Advance Offset, Inc. appeared before the PTO. Fifty-two United States patents, fifteen foreign patents and seventeen literature references were before the PTO examiner, who made an independent search of the prior art and considered the evidence and argument. The PTO examiner ruled that "all the claims are considered to be patentable." A charge by Western that the PTO had been uninformed or misled by Fromson was rejected by the Assistant Commissioner for Patents.
In 1976 Fromson sued Advance Offset Plate, Inc. (Advance) for infringement of the same claims as to which Western is charged with infringement. Fromson v. Advance Offset Plate, Inc., 219 U.S.P.Q. 83 (D.Mass.1983) [Available on WESTLAW, DCT database]; 720 F.2d 1565 (Fed.Cir. 1983); 223 U.S.P.Q. 1132 (D.Mass.1984) [Available on WESTLAW, DCT database]; 755 F.2d 1549 (Fed.Cir.1985); unreported opinion on damages, No. 76-4515-K (D.Mass. Dec. 11, 1986) (appeal pending). An initial judgment of non-infringement was vacated on appeal. On remand, the trial court held that the Advance plates infringed claims 1, 4, 6, 7, 12 and 16 of the '461 patent, but that the patent was invalid for obviousness. This conclusion of invalidity was reversed on appeal. The damage award in Advance is now on appeal. Other actions are pending against Imperial Metal & Chemical Co., Citiplate, Inc. and RBP Chemical Company.
The '461 patent contains sixteen claims, eleven of which are product claims and five of which are process claims. Fromson alleges infringement by Western of claims, 1, 4, 6, 7, 12 and 16 of the '461 patent. Claim 1 is as follows:
1. A sensitized photographic plate comprising an aluminum sheet which has been treated to produce an aluminum oxide coating thereon, a water-insoluble, hydrophilic, organophobic layer on said sheet resulting from the reaction of the aluminum oxide coating and an alkali metal silicate applied to said coating, and a light-sensitive coating over said layer having one solubility in relation to a solvent in a state before exposure to light and another solubility in relation to said solvent in another state after exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.
Claim 4 differs by specifying anodizing to form the oxide coating and reciting a light-sensitive coating of poly-vinyl alcohol and a bichromate. Claim 6 specifically identifies a diazo resin as the light-sensitive coating. Claim 7 defines a plate that is ready to print  that is, after exposure and development. Claim 12 describes the method for making a Claim 1 plate. Claim 16 is the Claim 12 method specific to diazo.
*865 In the 1950's Western produced and sold silicated aluminum wipe-on plates. Concern over infringement of the Jewett patent led Western to seek an alternative to silication. In the early 1960's Western experimented with electrolytically grained aluminum plates, which were found to be unsatisfactory for lithographic use unless they were also silicated. The process followed by Western was that taught by United States Letters Patent No. 3,072,546 (the Wruck patent), which teaches electrolytic graining in hydrochloric acid using alternating current. The parties offered competing evidence at trial concerning whether electrolytic treatment inherently forms an oxide. The proof offered by Western that such an oxide forms, embodied in 1978-81 scientific publications, is not prior art. Wruck itself teaches that the treatment forms aluminum hydroxide and expressly states that the plates have "no visible trace of oxidation." An analysis of the Wruck plates performed for Western by Alcoa Research Laboratories identified a natural oxide coating. Hence, even if, contrary to Wruck's teachings, electrolytic graining did result in an oxide film, the film did not have the enhanced characteristics of hardness or corrosion or abrasion resistance attributable to anodization.
The first Wruck plate produced by Western, Chemical Grain, comprised an aluminum plate electrochemically grained in hydrochloric acid and silicated. Chemical Grain essentially embodied the Jewett patent process. Granite Grain, another Wruck plate, represented Western's first commercial anodized and silicated aluminum plate. Western failed to show by clear and convincing proof that Granite Grain was prior art to Fromson: no catalogue of Western products earlier than 1968 includes Granite Grain; Western sales records from 1963 and 1964 indicate no Granite Grain sales; in February 1965 sales of the plates had not yet begun.
Western offered evidence of experimental work with anodized and silicated plates prior to Granite Grain and prior to the Fromson patent. The Court, however, finds that evidence unreliable and inconclusive. There is no evidence of success; Western neither commercialized nor publicized its results. Furthermore, Western waited until 1975 to accumulate documentary evidence of its own claimed invention and failed to preserve the testimony of Les Nelson, the individual alleged to have performed the work for it. Whatever work Western may have done with anodized silicated plates prior to issuance of the '461 patent does not represent prior art.
Western additionally offered evidence of prior invention by six third parties: Polychrome, Lithoplate, Meister and Holden of 3M, Wood, Alcoa and Adams. Apart from the testimony of Mr. Adams at trial, however, the evidence adduced by Western was unreliable, consisting of unauthenticated research notebooks, third-party correspondence and deposition testimony in an unrelated action. There is no evidence that any of the alleged prior inventors appreciated the significance of his work. There is no evidence that either Meister and Holden or Adams ever commercialized or publicized the results of their work with anodized silicated plates. Western has failed to offer clear and convincing evidence of prior third-party invention.
The published prior art presented to the Court consists of the following:
1. The Jewett patent. Described supra.

2. The Wruck patent. Described supra.

3. The Adams patent 3,073,765. The Adams patent describes the preparation of an aluminum lithographic plate by alternating current electrolytic graining in hydrochloric acid or nitric acid, followed by passivating by application of sodium silicate. Adams describes particular conditions for alternating current graining in hydrochloric acid and further incorporates the German patent 700,726, which describes alternating current graining in nitric acid. The Adams patent also teaches the application of a light sensitive resin to the grained and passivated plate.
4. The Belgian patent 622,409. The Belgian patent describes an electrophotographic *866 coating on an aluminum support. The latter is anodized to produce a thick oxide coating. However, since oxide is not a good conductor, one must treat the oxide coating with an aqueous solution of metal salts  for example, sodium silicate. One next applies a photo-conductive layer, comprised of a binder resin applied as one would a diazo resin. This layer is given an electric charge and then exposed to light in the shape of the desired image. A toner with an opposite charge is applied and is attracted to the exposed portions of the plate.
5. The Dowdall patent. The Dowdall patent teaches the equivalent use of polyacrylic acid or sodium silicate to create a water insoluble, hydrophilic organophobic substrate to which diazo resin is applied. As in Jewett, the treatment is of an aluminum surface cleaned and descummed in 70% nitric acid.
6. The Wood patent 2,681,310. The Wood patent discloses the preparation of a lithographic plate by anodizing aluminum to form an aluminum oxide coating, then treating with polyacrylic acid to produce a surface of enhanced water receptivity and durability.
7. The Edwards patent 1,946,153. The Edwards patent discloses anodizing and silicating aluminum for the purpose of providing corrosion protection to an aluminum surface.
Apart from the Dowdall patent, these published prior art references were before the Patent Examiner in the Reissue Proceeding and before the Court in the Advance litigation. These prior proceedings did not result in the invalidation of any of Fromson's claims. Western's assertion that Dowdall illuminates the pertinence of Wood by teaching the equivalence of sodium silicate and polyacrylic acid is unpersuasive. The fact remains that Western has failed to demonstrate that any other producer of lithographic plate had lighted on the Fromson process. Furthermore, elements of the prior art suggested that the Fromson invention would not succeed: Jewett found anodized aluminum unsuitable for lithographic purposes in trying to follow Kalle & Co. in French patent 904,255. Azoplate rejected Fromson's anodized aluminum samples as unsuitable for lithography. Lith-Chem-Co ceased distribution to the American lithography market of anodized plates from Germany because of poor performance. In light of these prior failures to adapt anodized aluminum to lithographic uses the Court cannot accept Western's argument that a construction of Dowdall and Wood together would incontrovertibly suggest the Fromson invention, to one of ordinary skill in the art in 1962. The parties agree that a person of ordinary skill in the art at that time would have had a bachelor's degree in chemistry or chemical engineering plus several years' experience in the field. Although the evidence demonstrates that one of ordinary skill in the art would be familiar with durability-enhancing qualities of sulfuric acid anodizing and with the compatibility of sodium silicate and diazo resin, Western has not demonstrated by clear and convincing evidence that Fromson's invention would be obvious or even worth attempting, in light of previous failures in the field.
The conversion of metro newspapers from letterpress to lithographic offset printing beginning in the mid-1960's created a substantial new market for lithographic printing plates. The availability of photocomposition equipment that eliminated the necessity of producing type from hot metal provided the initial impetus for the conversion. The conversion, however, further required high speed web offset presses first available in 1966 and was fundamentally facilitated by the development at about that time of automatic plate processing equipment and suitable inks and papers.
Western began providing lithographic plates and other products to metro newspapers in 1966. Its involvement in the conversion process was comprehensive: it provided the market plates, chemicals, plate processing equipment, plate room design and layout, training of personnel, start-up assistance, trouble shooting and general promotional services. In 1968 Western directly participated in the Sacramento Union's conversion to offset lithography. The *867 Sacramento Union was the first metro newspaper to undergo the conversion; Western subsequently played an important role in the conversion of other metro newspapers. Its efforts in this regard, as well as its provision of equipment and chemicals necessary to the conversion, were instrumental in creating this substantial market for lithographic plates.
The anodized lithographic plate did not constitute a factor in the conversion of metro newspapers from letterpress to offset. Western was the principal original supplier to metro newspapers, and the main product it provided was a ball-grained silicated aluminum plate offering an adequate run-length at a low cost. During the initial conversion period, the sales volume of lithographic plates was too low to justify the cost of anodizing plates through a continuous coil process, and Western's inexpensive ball-grained plate retained a substantial market share. Increase in demand attributable to ongoing newspaper conversions along with improvements in coil anodizing technology in the late 1960's made coil anodizing economically feasible by the early 1970's. Western's competitors at that time began offering anodized plates at a lower price than Western's ball-grained product and Western's market position eroded.
Coil anodization is not an element of the '461 patent.
As this Court previously found, Fromson did not attempt to enter the metro newspaper market until 1977 and did not have an effective marketing organization until 1979 or 1980. Fromson's ability rapidly to achieve a substantial share of the metro newspaper market was due to competitive manufacturing costs attributable to coil anodization.
Graining of an aluminum substrate contributes substantially to the durability of a lithographic plate. An ungrained anodized and silicated plate has a run length between 25,000 and 50,000 impressions. Electrolytic graining prior to anodization will increase the run-length to as much as 200,000; brush grained anodized and silicated plates will run 75,000 to 100,000 impressions. Neither Western nor Fromson has ever commercialized an ungrained plate. Graining is not an element of the '461 patent.
The commercial success of anodized silicated plates is attributable to the existence of a large newspaper market created through the efforts of Western and exploitable as a result of Western's provision of equipment and chemicals for use in offset printing. The durability of the plates used in the newspaper market is attributable at least in part to graining prior to anodization. Fromson's commercial success is due to the economics of coil anodization, which have enabled him to undersell his competitors.

CONCLUSIONS OF LAW
This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338.
Western directly and contributorily infringed claims 1, 4, 6, 7, 12 and 16 of the '461 patent by anodizing aluminum sheet to produce an aluminum oxide coating thereon, by applying sodium silicate to this oxide coating to produce a hydrophilic, organophobic layer on the sheet, by coating the treated sheet with a light-sensitive material to produce a printing plate, and by selling treated sheets as wipe-on plates to customers who would use them as photolithographic printing plates. That Western only sold anodized and silicated plates that had previously been grained is not significant to the issue of infringement. Western did not persuade the Court that a grained aluminum sheet was other than an "aluminum sheet" as specified in the '461 patent. Western sold plates manufactured according to the Fromson process.
A patent is presumed valid and the burden of establishing invalidity rests on the party asserting it. 35 U.S.C. § 282. The presumption is static and can be overcome only by clear and convincing evidence that the patent is invalid. American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359-60 (Fed.Cir.1984). Prior proceedings  decisions of a Patent Examiner on an original or reissue application and *868 conclusions of validity by a court in prior infringement actionsare not binding on a court. Fromson II, 755 F.2d 1549 (Fed.Cir. 1985). They are, however, evidence a court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence. American Hoist, 725 F.2d at 1359-60.
In deciding the legal question whether the patent is invalid for obviousness under 35 U.S.C. § 103, this Court has considered the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of skill in the pertinent art. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Additionally, the Court has weighed the evidence of "secondary considerations"  the long-felt need for the patented process and its commercial success  in evaluating the obviousness of the '461 patent. Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1539 (Fed.Cir.1983).
The Court concludes that defendant Western has failed to meet its burden of overcoming the presumption of validity of the '461 patent by clear and convincing evidence.
The parties do not dispute that the '461 patent is a combination patent comprised of several elements, each of which was old art. The proper inquiry for this Court, however, is whether "there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination." Lindeman Maschinenfabrik GmBh v. American Hoist & Derrick Co., 730 F.2d 1452, 1462 (Fed.Cir.1984), cited with approval in Fromson II, 755 F.2d at 1556. The record does not support the conclusion that the prior art suggested the '461 patent. Indeed, the record supports the conclusion that prior efforts suggested that the Fromson process would not succeed.
The Court heard competing testimony of defendant's witness Adams and plaintiff's witness Leonard concerning whether the prior art, and particularly the teachings of Dowdall and Wood, would make the Fromson process obvious. The Court concludes that Mr. Leonard's testimony was supported by the evidence at trial: The prior art teaches all around the patent without reaching the Fromson result. See Fromson II, 755 F.2d at 1553 (citing Patent Examiner at original proceeding). In light of the obstacle to plate manufacturers presented by the Jewett patent, and of the need for a durable, long-running plate to serve the metro newspaper market, a reasonable and permissible conclusion is that had the process been obvious Western could have presented evidence that someone else had developed it. See Stratoflex, 713 F.2d at 1538 (evidence of secondary considerations "may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious was not"), citing with approval in Fromson II, 755 F.2d at 1556. Western's evidence to this effect was unpersuasive.
This Court rejects Western's attack on the Reissue Proceeding, implicitly rejected by the Federal Circuit in Fromson II, 755 F.2d at 1558. The Court will rather extend "the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art." American Hoist, 725 F.2d at 1359.
Western argues that Fromson should be barred by the doctrine of laches from recovering damages for Western's sales of Fromson-type plates. Concededly, the evidence at trial established that Western infringed the Fromson patent as early as 1968; Fromson did not initiate this action until 1982. Fromson demonstrated to the Court, however, that he did not have the means of determining whether commercial plates had been silicated until 1974. Furthermore, Fromson established that Western deliberately sought to conceal its process throughout the 1970's. Fromson sought to negotiate licenses with infringers throughout the industry upon learning of infringement, and brought suit only after Western declined to enter into a licensing *869 agreement. While the Court recognizes that initiation of this action almost twenty years after Fromson's initial patent application may have caused some prejudice to Western in its efforts to establish prior invention, the Court does not believe that Fromson deliberately delayed commencement of the action in bad faith. The Court will not, therefore, bar plaintiff's recovery through laches.
In arriving at an appropriate rate of assessment of damages, the Court is directed to hypothesize a negotiation between a willing licensor and licensee at the time the patent issued. TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 898-99 (Fed.Cir. 1986). In 1965 the metro newspaper market for lithographic plates had not been created. Defendant's witness Harvell testified that profits on lithographic plates were low as a result of low sales volume, and it could not have been anticipated at that time that they would increase significantly in the future. Evidence at trial indicated that plate profits have remained low in the intervening twenty years. The Court will therefore apply a standard profit of 10% for lithographic plate products. The Court finds that a willing licensee would be willing to pay a royalty of one quarter of its profits on its product attributable to the patented invention. In this case, the evidence showed that the infringing plates produced by Western, which were electrolytically grained prior to anodization, had run-lengths of 125,000 and 200,000 impressions as contrasted with an anticipated run-length of 25,000 to 50,000 impressions on the Fromson plate. If profits are to be measured for sales to an industry that valued durability and run-length over all plate characteristics, which is an appropriate measure since the metro newspaper market accounted for the bulk of sales of Fromson-type plates, one-third of the profits may reasonably be attributed to the Fromson invention. This Court therefore concludes that Fromson is entitled to 2.5% of the one-third of Western's profits attributable to the patented invention, which yields a royalty of 0.825%, subject to prejudgment interest. The Court does not find wilful infringement by Western such as would support a treble damage award. Neither does the Court find this to be an appropriate case for the award of attorneys' fees.
NOTES
[1] Western was, at the time of filing of this action, a wholly-owned subsidiary of defendant Bemis Company, Inc. (Bemis). On April 30, 1987 Bemis sold all the outstanding capital stock of Western to Mitsubishi Chemical Industries America, Inc. (Mitsubishi). The sale was carried out pursuant to a Purchase Agreement between the parties dated April 1, 1987 which included a hold harmless clause running in favor of Mitsubishi. By stipulation of the parties, Bemis was made a defendant to this action and has agreed, in accordance with the Purchase Agreement, to satisfy any judgment entered against defendant Western.