**Howard A. FROMSON, Plaintiff,**

v.

**CITIPLATE, INC., Defendant.**

No. 82 C 0986.

United States District Court,
E.D. New York.

Oct. 14, 1987.

Felfe & Lynch, New York City (John E. Lynch, Alfred H. Hemingway, Jr., of counsel), for plaintiff.

Stoll, Wilkie, Previto & Hoffman, New York City (Robert S. Stoll, Doris S. Hoffman, of counsel), for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Fromson brought this suit under the patent laws against defendant Citiplate, Inc. (Citiplate) alleging infringement of United States Patent No. 3,181,461 (the '461 patent) issued May 4, 1965 for use in planographic printing.

The court postponed the trial several times, in part to await the outcome of a suit brought by Fromson in the United States District Court for the District of Massachusetts against Advance Offset Plate, Inc. (Advance Offset) for infringement of the same patent. That court found no infringement and gave judgment for Advance Offset. 219 U.S.P.Q. 83 (D.Mass. 1983). The Court of Appeals for the Federal Circuit reversed and remanded. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (Fed.Cir.1983).

The District Court then determined that Advance Offset had infringed certain claims of the patent but had shown the patent invalid because its subject matter would have been obvious to one skilled in the art. 223 U.S.P.Q. 1132 (D.Mass.1984) [Available on WESTLAW, 1984 WL 1390]. The Court of Appeals for the Federal Circuit again reversed, *Fromson v. Advance*

*Offset Plate, Inc.,* 755 F.2d 1549 (Fed.Cir. 1985), and held that Advance Offset had not proven invalidity of the patent and that the District Court had properly found infringement.

Fromson has moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to liability on the same claims (numbers 1, 4, 6, 7, 12, and 16) as were at issue in the *Advance Offset* case. Citiplate argues that the patent is (a) invalid because anticipated by prior art not presented to the patent office or to the courts in the *Advance Offset* case and (b) unenforceable because Fromson committed fraud on the patent office. Citiplate has moved for summary judgment on the ground of laches and estoppel.

## I. THE FACTS

The pertinent facts as set forth in the 1985 opinion of the Court of Appeals in the *Advance Offset* case, 755 F.2d at 1551–1553, and in the present record are as follows.

### Background

The art of lithography is based on the fact that greasy substances and water do not mix. Originally lithographic printing used a stone substrate with a "hydrophilic," or water-attracting, smoothed surface. The lithographer would trace the desired image on the substrate with a greasy "hydrophobic," or water-repellant, substance, and would thereafter treat the stone surface successively with water and ink. The hydrophilic stone substrate attracted water and repelled the subsequent treatment of the "greasy" or hydrophobic ink. The greasy image area repelled the water and subsequently attracted ink. The stone surface was then pressed to yield an image.

In the last century photographic means were introduced to create the image on the surface, making it unnecessary to draw the image with a greasy substance. The first photolithographic plates had a coating of a light-sensitive composition of egg white and potassium dichromate, creating "albumin plates," which were then exposed to light through a negative. In the 1930's,

"deep-etch" plates were introduced, coated with dichromate to form a stencil, which was removed in developing the plate. Following World War II, diazonium salts, or "diazos," were used as light-sensitive coatings.

In modern lithographic printing lighter materials have replaced the stone substrate. Initially, grained or roughened zinc was employed, then aluminum found wide acceptance.

In modern photo-lithographic printing, a substrate is prepared, light-sensitized, exposed, and then developed. A treatment may be applied to highlight the image so that the printer may see the prepared surface. The plate is then mounted on a roller to receive successive water and ink treatments. The prepared and treated surface is used to print, directly or with an offset mechanism.

The dominant patented photo-lithographic plate on the market before the '461 patent issued was made in accordance with United States Patent No. 2,714,006 to Jewett and Case (the Jewett patent) issued on July 26, 1955. That patent teaches preparation of a presensitized lithographic plate composed of an aluminum base treated with a solution of an alkali metal silicate (preferably a relatively dilute solution of sodium silicate) by dipping the aluminum surface in the silicate solution to form an insoluable, hydrophilic silicious surface which is then treated with a light-sensitive diazo coating. The coated plate is exposed to light through a negative and afterwards desensitized by wiping with a gum arabic solution to dissolve and remove the diazo that did not react to light.

### A. *The Fromson Discovery*

In the 1950's Fromson, then selling metals, began through Ano–Coil Corporation to make and sell anodized aluminum, mainly for television antennas, furniture tubing, and nameplates. Fromson had no background in lithography.

Aluminum when exposed to the atmosphere develops a "natural oxide coating," approximately fifty to one hundred angstroms thick. Means to create thicker ox-

ide coatings have long been known. In anodization an electrical current applied to aluminum metal in an electrolyte bath through electrodes will form an oxide coating approximately one micron or more thick. Fromson was manufacturing anodized aluminum by a contemporary process called continuous coil anodization, whereby a web of aluminum may be anodized continuously without the need for laboriously mounting aluminum on racks and anodizing in batches. Fromson, seeking new markets for his anodized aluminum, talked to a company that was doing lithographic printing. Although the samples provided to that company were unsuitable, he continued to experiment and thereafter found that anodized aluminum, when treated with an aqueous solution of sodium silicate, would make a useful printing plate, resistant to corrosion, scratching, and abrasion and having a long press life.

### B. *The '461 Patent and its Claims in Dispute*

The '461 patent issued to Fromson on May 4, 1965, upon application filed May 10, 1963. The patent contains 11 claims to a photographic plate for use in planographic printing and 5 claims to a process for its manufacture. In planographic printing, as opposed to raised letterpress or engraving printing, image and background are in the same plane on the printing plate surface, and the principles of lithography are employed.

As noted above, Claims 1, 4, 6, 7, 12, and 16 are at issue here. Claims 4 and 6 are here reproduced in subparagraph form.

4. A sensitized photographic printing plate comprising:

an aluminum sheet having a surface which has been anodized to form an aluminum oxide coating on said surface and which has been sealed,

a water-insoluble, hydrophilic, organophobic layer on said sheet resulting from the reaction of the aluminum oxide coating on said sheet and sodium silicate applied to said coating, and

a water-soluble, light sensitive coating over said layer comprising polyvinyl alcohol containing a light-sensitizing agent of

the class consisting of ammonium bichromate, sodium bicromate, potassium bichromate, and cupric bichromate, said light-sensitive coating having the properties of being water-insoluble, hydrophobic and organophilic after exposure to ultra-violet light.

6. A sensitized photographic printing plate comprising:

an aluminum sheet having a surface which has been treated to form an aluminum oxide coating on said surface,

a water-insoluble, hydrophylic, organophobic layer on said sheet resulting from the reaction of the aluminum oxide coating and an alkali metal silicate applied to said coating, and

a water-soluble, light sensitive diazo resin coating over said layer having the properties of being water-insoluble, hydrophobic, and organophilic upon exposure to ultra-violet light.

Claim 1 refers to a sensitized photographic printing plate and is broader than claim 6 in its description of the light-sensitive coating. In claim 7, a water-insoluble, image forming coating is exposed in the non-image areas of the plate.

Process claim 12 (here reproduced in part in subparagraph form) calls for:

applying to an aluminum sheet having a coating of aluminum oxide, a water-solution of an alkali metal silicate to cause the silicate to react with the aluminum oxide to form a water-insoluble, hydrophylic, organophobic layer on said sheet, drying the layer, and

applying over the dry layer a light-sensitive coating having one solubility in relation to a solvent in a state before exposure to light and another solubility in relation to said solvent in another state after exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.

Claim 16 depends from claim 12 and specifies a light-sensitive coating of diazo resin.

### C. Commencement of Suit against Advance Offset

In 1976 Fromson sued Advance Offset for infringement. Advance Offset admitted that it made · and sold lithographic plates from an aluminum sheet with an oxide coating formed by anodization and treated in an aqueous solution of sodium silicate and that its customers applied a diazo coating to the plate. Advance Offset denied infringement, asserted invalidity, and counterclaimed for fraud, misuse, antitrust violations, and unfair competition.

### D. 1979–1980 Proceedings before the Patent and Trademark Office

On April 19, 1979, after the commencement of the *Advance Offset* suit, Fromson applied to the Patent Office for a declaration under the "no defect" proceeding established by 37 CFR 1.175(a)(4). The district court denied Fromson's motion to stay the action until completion of that proceeding. ·

Advance Offset participated actively in the proceeding, as did protestors Imperial Metal and Chemical Company, E.I. Du Pont de Nemours & Company, and Western Litho Plate & Supply Company. Advance Offset made eleven separate submissions attacking validity of the '461 patent for (1) obviousness in view of 17 prior art patents, (2) prior knowledge and sale, (3) non-compliance with 35 U.S.C. § 112, and (4) fraud on the patent office. Fifty-two United States patents, fifteen foreign patents, and seventeen literature references were cited to the Examiner.

Fromson invited Citiplate to participate in the proceeding initiated but it declined to do so.

The Examiner considered each of the protestors' arguments and rejected them with explanation.

As to the allegations that the invention would have been obvious, for example, the Examiner said "[n]one of the references cited individually or collectively [sic] clearly teach [sic] or make [sic] obvious the formation of an oxide layer on an aluminum base followed by a silicate treatment followed by application of a light-sensitive material."

*Fromson v. Advance Offset Plate, Inc.*, *supra*, 755 F.2d at 1552. Respecting process claims 12 and 16, the Examiner concluded that the references "fail to teach this process and do not clearly make it obvious to the mechanic having ordinary skill in the art." *Id.* at 1553. The Examiner further held that "[w]hile the concept of treating the aluminum oxide coating is clear, the specific combination under consideration is not specifically taught. The prior art fails to show clear error in the prior determination of patentability." *Id.* In a second decision responding to protestors reiterations, the Examiner said "As was previously stated, the prior art is extremely close to the invention claimed. It teaches all around it, but it does not quite hit the target." *Id.*

The Examiner referred protestors' allegations of "fraud on the patent office" to the Commissioner. On December 22, 1980, Assistant Commissioner Tegtmeyer concluded that "the evidence is not 'clear and convincing' that applicant practiced or attempted any 'fraud' on the Office or 'violated any duty of disclosure' through 'bad faith or negligence'". *Id.*

### E. The Sumner Williams Plates

Although Citiplate declined to participate in the "no defect" proceeding, it now urges that alleged prior art not submitted to the patent office, or to the courts in the *Advance Offset* case, anticipated the invention. Citiplate apparently did not inform Fromson's attorneys of the nature of this art until after the filing of the present motion.

That art consists of plates developed by one Sumner Williams. Through his company Sumner Williams, Inc. (which Citiplate acquired in 1975 or 1976), he manufactured, advertised, and sold to customers so-called ST aluminum plates at least one year before Fromson made his invention in 1963. In his deposition Williams said that he first sold these plates in 1953. He testified that he never applied for a patent or published any article or other information as to how to make the plates but "more or less" maintained the process as a "trade secret."

In his deposition Williams described the process whereby he made the plates as follows. He bought aluminum plates in coil form, cut them to approximate sizes, degreased them, blasted them with an aluminum oxide abrasive, cleaned them "to get rid of the excess flour from the aluminum oxide breakdown of the grit," desmutted them, and silicated them with sodium silicate. He testified that the lithographers would then buy the plates through dealers and apply a light-sensitive coating. According to Williams, he deliberately blasted the aluminum sheets with aluminum oxide in order, "Number one, to put a grain to anchor the coating, for it to hold onto, because it wouldn't hold onto a smooth surface, and to create a harder surface for longevity."

He did not anodize the aluminum sheet to form the aluminum oxide coating. Citiplate's counsel asked Williams, "Did you ever consider manufacturing anodized and silicated plates on a commercial basis?" The reply was: "No. I might have thought about it but the answer is no." Citiplate's counsel also asked the following question: "This Claim 4 [of the '461 patent] refers to an anodized plate, does it not?" Williams answered: "Right, which we did not do." When counsel pressed further, asking whether Williams ever "use[d]" anodized plates before 1961, Williams said: "Probably in testing. That's about all."

Williams did not testify that his blasting produced an oxide coating equivalent to the aluminum oxide coating formed by anodization, which creates a hard coating highly resistant to scratching, abrasion and corrosion. Fromson's expert, Dr. Gerald Harvey Kissin, states in an affidavit that such blasting does not produce such a coating and that "[A]nodic treatment in electrolytes in which aluminum is only slightly soluble at temperatures below about 50°C is the only technique for forming hard oxide coatings which are highly resistant to scratching, abrasion and corrosion."

A report dated November 8, 1962 made by Arthur D. Little, Inc. for Litho Chemical and Supply Co. Inc. concerns a study of the Sumner Williams plate. The report states that the plate was examined by x-ray diffraction, x-ray fluorescence, and spectograph, and gives percentages for various substances. These do not include aluminum or aluminum oxide, but one sentence recites, "X–ray diffraction indicates that the major constituent of the surface of either side is hydrous aluminum oxide."

Fromson urges that this sentence, indicating oxide on both sides, shows that Arthur D. Little, Inc. found no more than the natural oxide that forms on exposure of aluminum. Williams's testimony that the primary reason for blasting was to put a "grain" on the surface, to make the coating hold, suggests that his blasting was applied to one surface. In any event, Citiplate offered no reports of experiments to show that such aluminum oxide coating as was present in the Williams plate was comparable in function to that obtained by anodization.

Williams testified that in approximately 1975 Sumner Williams, Inc. "ran into some financial problems, and Citiplate bought us out." Citiplate's Chairman Joseph Cusumano says that Citiplate acquired an 80% interest in the company in 1976 and another 20% in 1980.

### F. *Alleged Infringement by Citiplate*

According to Cusumano's affidavit, Citiplate was founded in 1953 and had previously been graining zinc plates. Between 1960 and 1962 it began to produce wipe-on plates using grained aluminum. Cusumano states that the "graining caused the aluminum to oxidize and then we silicated it." He does not state what substance Citiplate used at that time to grain the plates or whether the aluminum oxide that resulted was comparable in function to the coating achieved by anodic treatment.

It was not until the latter part of 1974, more than ten years after Fromson applied for the '461 patent, that Citiplate began, according to Cusumano, to manufacture and sell anodized aluminum lithographic plates treated with silica. He says that when "Citiplate decided to oxidize aluminum by anodizing, it did not appear to be a significant development but rather an extension of what Citiplate had always

been doing." Admittedly, after switching to anodized aluminum plates Citiplate substantially increased its business, acquiring in August 1980 DuPont's lithographic plate manufacturing equipment and technology and expanding its plant in Jackson, Tennessee, presumably acquired from Sumner Williams, Inc.

## II. CONTENTIONS OF THE PARTIES

Fromson urges that (a) Citiplate has not shown sufficient facts to raise a bona fide dispute of material fact as to the presence of clear and convincing evidence of invalidity, and (b) Citiplate has willfully infringed the patent. Citiplate defends on the following grounds: (a) invalidity because of prior knowledge and use of the invention, (b) unenforceability because of fraud on the patent office, (c) laches and estoppel, and (d) noninfringement.

## III. ALLEGED INVALIDITY OF THE PATENT

Citiplate asserts invalidity under 35 U.S.C. § 102(a), (b) and (g), providing, in pertinent part, as follows:

§ 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country ... before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

By 35 U.S.C. § 282 the patent is "presumed valid," and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." To overcome this proce-

dural requirement Citiplate must show invalidity by "clear and convincing evidence." *Fromson v. Advance Offset Plate, Inc., supra,* 755 F.2d at 1555.

The Supreme Court has recently addressed itself to the circumstances under which summary judgment pursuant to Rule 56 is proper where the party moved against has the evidentiary burden. The Court has held that summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and that the standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." *Id.; see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Were this a jury case and were this court considering whether to allow the case to go to the jury based on the evidence now submitted, the court would have to consider whether reasonable people could find that Citiplate had shown "by clear and convincing evidence" that the patent is invalid. Thus, the test on this motion is whether the court, drawing all permissible inferences and resolving all significant doubts in favor of Citiplate, can say that Citiplate has not clearly and convincingly shown invalidity.

This court does not read the cases cited by Citiplate to apply different criteria. In *Finish Engineering Company, Inc. v. Zerpa Industries, Inc.,* 806 F.2d 1041 (Fed.Cir. 1986), the court reversed a summary judgment holding a patent invalid, and the effect of the presumption of 35 U.S.C. § 282 to defeat a motion for summary judgment was not in question. In *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 954 (Fed.Cir.1987), the court reversed a summary judgment against the party seeking a declaration of non-infringement, and the significance of the statutory presumption of patent validity was not in issue.

As the District Court in the *Advance Offset* case observed, the difference between the art taught by the '461 patent and the prior art then before the court was that the '461 patent "combines anodization, silication and application of a light-sensitive substance into one process." 223 U.S.P.Q. at 1137. Chief Judge Markey's opinion on appeal held that the record did not indicate "a basis on which it can be said that the making of that combination would have been obvious when it was made." 755 F.2d at 1556. Yet each of the three previously separate process steps was old art. 223 U.S.P.Q. at 1137.

The patent specifications make clear that Fromson produced the aluminum oxide coating by anodization. It is true that in describing "an important feature" of the invention the specifications say that there is employed an aluminum sheet having an aluminum oxide coating "produced, for example, by anodizing the aluminum sheet." This indicates that Fromson took account of the possibility that an oxide coating of comparable function might be obtained by some unspecified means different from anodization. But the balance of the specifications, including the examples, assume that anodization will be used, and Example 1 describes the manner in which the anodic treatment is performed.

That anodization was a highly significant step in the combination is indicated by the commercial success of the invention and by the fact that Citiplate, and others, took that step only after the patent was issued.

Williams testified that he "did not do" anodizing, did not commercially manufacture anodized aluminum plates and he did not "use" anodized plates except "probably in testing." While, like others, he evidently knew of anodized plates, the statutory language of 35 U.S.C. § 102(a), "known or used by others in this country," means knowledge or use of the "invention" that is "accessible to the public." *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 139 (Fed.Cir.1986). Although he knew of the existence of anodized plates and of the process of silication, he plainly did not recognize the desirability of using an ano-

dized plate. The fact that he did not use anodization in making the lithographic plates he sold shows that he did not appreciate its significance or was unsuccessful in implementing it. *See Application of Felton*, 484 F.2d 495, 500 (C.C.P.A.1973); *Fromson v. Western Litho Plate and Supply Co.*, 670 F.Supp. 861, 865 (E.D.Mo. 1987).

Citiplate has submitted an affidavit of one Gordon H. Silver, an engineer who did consulting work for Sumner Williams, Inc. in 1959 and 1960. Silver claims that in May 1960 he invented an anodized, silicated aluminum lithographic printing plate having diazo as the light-sensitive material. His contemporary notes attached to the affidavit indicate that he conducted a "Proposed Experimental Approach" to treatment of aluminum plates by anodizing.

Citiplate also submits an affidavit by one Merrell N. Friend, who says he was employed as technical manager by Sumner Williams, Inc. He claims that in 1960 he received from Silver documents describing his invention and that he actually made some plates in accordance with it, using anodized aluminum.

 Early public disclosure is the "linchpin" of the patent system. *Horwath v. Lee*, 564 F.2d 948, 950 (C.C.P.A.1977). Whatever Williams, Silver and Friend knew about the silication on anodized plates they did not reveal to the public. Neither Silver nor Friend refutes Williams' sworn deposition testimony that his company never manufactured on a commercial basis anodized plates and that he never used anodized plates except probably in testing. Whatever work they did with anodized silicated plates prior to issuance of the '461 patent does not represent such prior art as to invalidate the patent. *Fromson v. Western Litho Plate and Supply Company*, *supra*, 670 F.Supp. at 865.

Citiplate's only other evidence of alleged knowledge by "others" of Fromson's "invention" is a "service report" dated June 23, 1960 in the files of Alcoa Process Development Laboratories in New Kensington, Pennsylvania. That report refers to a visit requested by Sumner Williams, Inc. due to

"some defect that the customer cannot explain" in the finishing operation of lithographic plates. Sumner Williams, Inc. asked Alcoa to investigate and comment on this defect.

After listing the Williams sequence of operations, including sandblasting with aluminum oxide, deoxidizing, and applying a 5% sodium silicate solution, the report describes the customer's problem as the occurrence of ink spots on areas that were only supposed to accept water. The author of the report indicates that Alcoa was unsuccessful in determining the cause of the defect and also states the following:

> The customer would like to use another method employing an anodic coating as a pretreatment. They received samples that were anodized in England and are pleased with the results. We agreed to have this coating examined as far as thickness, electrolyte type, and voltage was concerned and anodize samples at APDL. Mr. Bigony is making arrangements for them to become an approved Alumilite processor. They intend to set up their own anodizing facilities and desire our assistance.

These sentences do not show "knowledge" by Alcoa of the Fromson "invention." Nothing in the report suggests that anodizing and then silicating would have the effect that Fromson found. Thus the report does not show that the invention was made accessible to persons skilled in the art. *Carella v. Starlight Archery, supra,* at 139.[1] Citiplate submits no evidence that Sumner Williams, Inc. ever commercially used anodized plates or set up anodizing facilities.

Since Sumner Williams, Inc. did not use or sell anodized plates, Claim 4 was not invalidated by the widespread commercial "use" of the Williams plate, unless its use of aluminum sheets with some aluminum oxide coating later silicated made the invention claimed in Claim 4 obvious to one skilled in the art.

Had Williams attained an oxide coating comparable in effectiveness to that of Fromson, presumably he could have obtained a patent on his invention. After all,

the central point of the patent system is early public disclosure. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1550 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). He chose not to apply for a patent but to keep his findings secret. Whatever aluminum oxide coating he attained, Citiplate has not shown that it was equal in effectiveness to that produced by the anodization.

Of course, a subsequent inventor may not have a valid patent for products previously placed on sale more than a year before the filing of the patent application, *J.A. LaPorte, Inc. v. Norfolk Dredging Co.,* 787 F.2d 1577, 1581 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). Thus plates made having the same characteristics as the Williams plates could not be patented. But Citiplate has presented no evidence from which the court can find that the Williams plates were comparable to the Fromson plate or that an examination of them would have suggested anodization or would have made the invention described in Claim 4 of the '461 patent obvious to one skilled in the art.

The court, drawing all permissible inferences and resolving all significant doubts in favor of Citiplate, concludes that it has not presented evidence showing clearly and convincingly that Claim 4 is invalid.

The court cannot determine on summary judgment the validity of the attack on the other patent claims in issue. Those claims speak in terms not of anodization of the aluminum sheet but of the "treatment" of it, and as to those claims there are issues of fact that the court cannot resolve on the papers. The court cannot now say whether those claims embrace the Williams plate.

## IV. INFRINGEMENT

■ Citiplate has raised no substantial issue of material fact as to whether it infringed Claim 4. Admittedly, Citiplate combined anodization and silication in one process. An affidavit of James Butler, Citiplate's plant manager, contends that its anodized aluminum plates "are not believed

to infringe" Claim 4 because they either did not have polyvinyl alcohol at all or did not have polyvinyl alcohol of the class consisting of ammonium bichromate, sodium bichromate, potassium bichromate and cupric bichromate.

Almost the identical issue arose in the Court of Appeals for the Federal Circuit in the *Advance Offset* case. The court decided that the District Court did not err in reading the broader limitations of Claim 6 as to the light-sensitive agent into the narrower limitations of Claim 4 and in holding that Advance Offset had infringed under the doctrine of equivalents. 755 F.2d 1558–59. The specifications of the patent show that the light-sensitive material "may be a water-soluble, light-sensitive diazo resin, or a polyvinyl film-forming resin."

This court decides that Citiplate has infringed Claim 4 as well as the other claims. Whether the infringement was willful should await trial on the issue of damages.

## V. ALLEGED FRAUD ON THE PATENT OFFICE

The court finds no merit in Citiplate's claim that Fromson made material false statements to the Patent Office both in 1964 during prosecution of the original application and in 1980 when the patent was re-examined. The alleged false statements were made concerning the Jewett Patent.

Citiplate contends that despite the fact that the Jewett Patent instructed the use of 70% nitric acid on aluminum, Fromson conducted tests using 10% nitric acid and in 1964 represented to the Patent Examiner that the results established the superiority of his invention. Citiplate says this was misleading.

As to the alleged 1980 fraud Citiplate asserts that the examiner was of the opinion in August 1980 that any aluminum oxide coating "of any thickness and form" would invalidate all but Claims 4 and 5 of the patent, and that Fromson stated to the Patent Office examiner that Jewett was "not seeking" to produce such a coating. According to Citiplate this was false because Fromson knew that the nitric acid

that Jewett used would cause such a coating to form.

■ This court need not determine whether Fromson's statements were inaccurate. After the examiner rejected in August 1980 all but Claims 4 and 5 under 35 U.S.C. §§ 102 and 103, he received further presentations by the parties. In November 1980 he withdrew the rejection and made the following comments.

The 35 U.S.C. 102 and 35 U.S.C. 103 rejections are, as applicant contends, in direct conflict with the finding on review of the previous examination. The reasoning and intent being that when taking the prior art at face value with the structure disclosed therein considered to be accurate, the claims under consideration are not anticipated or obvious in view of such prior art. However, the issue was raised that the structure of this prior art is in fact the same as that under consideration; that by following the procedures outlined in such prior patents an oxide layer is in fact manufactured. While this allegation is in conflict with the specific teachings of the prior art, evidence was introduced that indicated the possibility the prior inventors were wrong in their evaluation of the article produced. Since the presence of such an oxide could render the presently considered claims anticipated and/or obvious, the issue needed to be addressed.

The thickness and specific form of the oxide is not critical *as claimed*. Only the presence of a manufactured oxide is set forth. It is assumed that this would produce an oxide that is different in structure or form from the natural oxide for any specific given process, such as by acid treatment. Note for example, the statement on page 14 of Paper No. 33 filed September 26, 1980 setting forth the inability of the natural oxide on aluminum to combine with the silicate to form the hydrophilic layer. The oxide manufacturing must be capable of performing the invention. (Emphasis in original).

Moreover, the identical arguments now made as to lack of disclosure were asserted

before the Assistant Commissioner for Patents. The issue there advanced was:

> Misrepresentation of the prior art that it was not known to treat a surface to form an oxide coating on said surface and to treat said oxide coating with silicate.

The Assistant Commissioner said that one of the protestors

> alleges that applicant [Fromson] seriously misled the Patent Office as to the teachings and import of the Jewett et al. patent that there is not, as suggested by Fromson, any teachings that the aluminum surface must be oxide free.

The Assistant Commissioner disposed of the issue in the following language:

> [T]he examiner has asserted that the inventor considered the silicate treatment and oxidation steps to be old and well known in the art. The examiner also held that none of the prior art anticipates or obviates any of the claims. Moreover, the examiner cited prior art including Mason, Jewett and others which teach the above noted process to be old. From the evidence and facts of record it has not been substantiated that applicant misled the Office as to any substantial subject matter disclosed in the prior art as the examiner was *well aware* that the oxidizing and silicate treatment were well known in the art. (Emphasis in original).

It is thus plain that whatever Fromson may have said it did not serve to mislead the patent office.

### VI. ALLEGED LACHES AND ESTOPPEL

█ Fromson filed this action on April 12, 1982. In moving for summary judgment Citiplate contends that Fromson delayed unreasonably in asserting his rights and misled Citiplate to its prejudice. Citiplate urges that therefore Fromson is guilty of laches and is estopped from recovering damages.

The law pertinent to Citiplate's motion is set forth in *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir.1984). The court may find patentee guilty of laches if (a) after first obtaining knowledge of an infringement, he has unreasonably and inexcusably delayed in filing suit, and (b) material prejudice to the infringer has resulted. A six year delay is presumptively unreasonable, but the patentee may show an adequate excuse.

Fromson denies that he knew more than six years before filing the complaint of Citiplate's infringement and that he misled Citiplate to its damage. Further, Fromson says that since 1976 Citiplate knew that Fromson, although he had limited means, intended to enforce his patent rights, and that any harm occurring to Citiplate was its own fault.

Although Fromson had in his files a Dun and Bradstreet report on Citiplate dated February 1976, Fromson wrote the first letter to Citiplate about possible infringement on September 3, 1976, less than six years before the filing of the complaint. That letter does not establish that at that time Fromson had actual knowledge of Citiplate's infringement, but does show that Fromson was interested in enforcing his patent. The later correspondence between the parties does not demonstrate that Fromson was condoning any infringement that Citiplate might be committing.

The court must determine an equitable defense such as laches or estoppel in each case under its particular facts. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir.1986). There are genuine issues of material fact raised by Citiplate's motion that the court may not resolve on the present papers.

### VII. CONCLUSION

Fromson may have summary judgment adjudicating that Citiplate has not sustained its burden of showing Claim 4 of the '461 patent invalid. Fromson's motion for summary judgment is otherwise denied. Citiplate's motion for summary judgment and its application for attorneys' fees are denied. So ordered.