Howard A. FROMSON, Appellant/Cross-Appellee,

v.

ADVANCE OFFSET PLATE, INC., Appellee/Cross-Appellant.

Appeal Nos. 84–1542, 84–1553.

United States Court of Appeals, Federal Circuit.

Feb. 21, 1985.

John E. Lynch (argued), Felfe & Lynch, New York City, for appellant, cross-appellee.

Arthur F. Dionne (argued), Fishman & Dionne, Windsor, Conn., for appellee, cross-appellant.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and NICHOLS, Senior Circuit Judge.

MARKEY, Chief Judge.

Consolidated appeal and cross appeal from a judgment of the United States District Court for the District of Massachusetts, declaring claims 1, 4, 6, 7, 12, and 16 of United States Patent No. 3,181,461 (the '461 patent) invalid and infringed. The judgment of invalidity is reversed; the judgment of infringement is affirmed.

### Background

The art of lithography is premised on the immiscibility of greasy substances and water. As initially conceived and practiced, lithographic printing employed a stone substrate, the smoothed surface of which was "hydrophilic", or water-attracting. The image desired would be traced onto the substrate with a greasy "hydrophobic", or water-repellant, substance. Thereafter, the stone surface would be successively treated with water and ink. The non-image stone substrate, being hydrophilic, attracted water, and thus repelled the succeeding treatment of ink which, being essentially "greasy", is hydrophobic. The greasy image area, however, repelled the initial treatment with water and, subsequently, attracted ink. The stone surface was then pressed to yield an image.

In the last century, photographic means was introduced for creation of the image on the printing surface, rendering unnecessary the actual drawing with a greasy substance. The first photo-lithographic plates were produced by coating a plate with a light-sensitive composition of egg white and potassium dichromate, creating "albumin plates" which were then exposed to light through a negative. In the 1930's, "deep-etch" plates were introduced. They were dichromate coated to form a stencil eventually removed in developing the plate. Following World War II, diazonium salts, or "diazos", were used as light-sensitive coatings.

The smoothed stone substrate of the old art has been replaced in modern lithographic printing with lighter and more easily handled materials. Initially, grained or roughened zinc was employed, then aluminum found wide acceptance.

In modern photo-lithographic printing, a substrate is prepared, light-sensitized, exposed, and then developed. A post-development treatment may be applied to highlight the image so that the printer may see the prepared printing surface. The plate is then mounted on a roller to receive successive water and ink treatments. The prepared and treated surface is then used to print, directly or with an offset mechanism.

United States Patent No. 2,714,006 to Jewett (the Jewett patent) was the dominant photolithographic plate before the '461 patent issued. The Jewett patent teaches preparation of a presensitized lithographic plate composed of an aluminum base treated with a solution of an alkali metal silicate, preferably a relatively dilute solution of sodium silicate, by dipping the aluminum surface in the silicate solution to form an insoluable, hydrophilic silicious surface which is then treated with a light-sensitive diazo coating. The coated plate is exposed to light through a negative and afterwards desensitized by wiping with a gum arabic solution to dissolve and remove the diazo that did not react to light.

### A. The '461 Patent and Claims in Dispute

The '461 patent issued to Howard A. Fromson on May 4, 1965, upon application Serial No. 282,810, filed May 10, 1963. The '461 patent contains 11 claims to a photographic plate for use in planographic printing and 5 claims to a process for its manufacture. In planographic printing, as opposed to raised letterpress or engraving printing, image and background are in the same plane on the printing plate surface and the principles of lithography are employed.

Claims 1, 4, 6, 7, 12, and 16 are at issue in this appeal. Claim 6 (here reproduced in subparagraph form) is typical:

6. A sensitized photographic printing plate comprising:

an aluminum sheet having a surface which has been treated to form an aluminum oxide coating on said surface,

a water-insoluble, hydrophylic, organophobic layer on said sheet resulting from the reaction of the aluminum oxide coating and an alkali metal silicate applied to said coating, and

a water-soluble, light-sensitive diazo resin coating over said layer having the properties of being water-soluble, hydrophobic, and organophilic upon exposure to ultra-violet light.

Claim 1 is directed to a sensitized photographic printing plate and is broader than claim 6 in its description of the light-sensitive coating. Claim 4 is specific to the use of anodizing to form the sealed aluminum oxide coating, sodium silicate, and certain water-soluble, light-sensitive coatings. In claim 7, a water-insoluble, image forming coating is exposed in the non-image areas of the plate.

Process claim 12 (here reproduced in part in subparagraph form) calls for:

applying to an aluminum sheet having a coating of aluminum oxide, a water-solution of an alkali metal silicate to cause the silicate to react with the aluminum oxide to form a water-insoluble, hydrophylic, organophobic layer on said sheet, drying the layer, and

applying over the dry layer a light sensitive coating having one solubility in relation to a solvent in a state before exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.

Claim 16 depends from claim 12 and specifies a light-sensitive coating of diazo resin.

B. *Suit*

In 1976, Fromson sued Advance Offset Plate, Inc. (Advance) for direct and contributory infringement. Advance denied infringement, asserted invalidity, and counterclaimed for fraud, misuse, antitrust violations, and unfair competition.

On August 18, 1978, Fromson sued three of Advance's customers in separate actions: News Publishing Company of Framingham; Newspapers of New England, Inc.; and Graphcoat, Inc. In a May 30, 1980 Memorandum and Order, the district court consolidated the suits and separated the validity and infringement issues from those of fraud, misuse, antitrust violations and unfair competition.

C. *Proceedings before the Patent and Trademark Office*

On April 19, 1979, Fromson applied in the United States Patent and Trademark Office (PTO) for a declaration under the "no defect" proceeding established by 37 CFR 1.175(a)(4). The district court denied Fromson's motion to stay the court action until PTO proceedings on the application were concluded.

Advance participated actively in all stages of the proceeding, as did protestors Imperial Metal and Chemical Company, E.I. Du Pont de Nemours & Company, and Western Litho Plate & Supply Company. Advance made eleven separate submissions attacking validity of the '461 patent for (1) obviousness in view of 17 prior art patents, (2) prior knowledge and sale, (3) non-compliance with § 112, and (4) fraud on the patent office. The record discloses 52 United States patents, 15 foreign patents, and 17 literature references cited to the Examiner.

The Examiner considered and responded to each protestors' allegation in an initial decision and subsequent decisions on reconsideration in response to requests and additional submissions by the protestors. Each argument of the protestors was rejected with explanation.

Respecting the allegations that the invention would have been obvious, for example, the Examiner said "[n]one of the references cited individually or collectively [sic] clearly teach [sic] or make [sic] obvious the formation of an oxide layer on an aluminum base followed by a silicate treatment followed by application of a light-sensitive material." Respecting process claims 12

and 16, the Examiner concluded that the references "fail to teach this process and do not clearly make it obvious to the mechanic having ordinary skill in the art." The Examiner further held that "[w]hile the concept of treating the aluminum oxide coating is clear, the specific combination under consideration is not specifically taught. The prior art fails to show clear error in the prior determination of patentability." In a second decision responding to protestors reiterations, the Examiner said "As was previously stated, the prior art is extremely close to the invention claimed. It teaches all around it, but it does not quite hit the target."

The Examiner referred protestors' allegations of "fraud on the patent office" to the Commissioner. On December 22, 1980, Assistant Commissioner Tegtmeyer concluded that "the evidence is not 'clear and convincing' that applicant practiced or attempted any 'fraud' on the Office or 'violated any duty of disclosure' through 'bad faith or negligence' ".

### D. *Trial*

On February 11, 1983, following a 7 day trial (June 29-July 9, 1982), the district court held (1) that the claims of the '461 patent, when read in light of the specification and the prosecution history, must be interpreted as *requiring* that the water-insoluable, hydrophilic, organophilic layer be the product of a chemical reaction between the aluminum oxide coating and the alkali metal silicate, and (2) that this product must be a compound having physical properties different from those of its constituents. Finding no such "reaction" in the preparation of Advance's photographic plates, the district court entered a judgment of noninfringement, but did not reach the issue of validity. 219 USPQ 83 (D.Mass.1983).

This court vacated the judgment, 720 F.2d 1565, 219 USPQ 1137 (Fed Cir.1983), because it rested on an error of law in interpreting the claims of the '461 patent as limited to the product of a chemical reaction "producing a new chemical compound in the restrictive sense of those words," 720 F.2d at 1571, 219 USPQ at 1142. This court remanded the case for further proceedings.

### E. *Proceedings on Remand*

Following remand, the district court held no further hearing but, on February 1, 1983, ordered both parties to file proposed findings and conclusions. Advance obtained an extension. After a December 20, 1983 conference, Fromson and Advance filed briefs, proposed findings and conclusions, and reply briefs.

### F. *The District Court's Memorandum Opinion*

On July 17, 1984, the district court entered judgment for Advance. In an unpublished memorandum opinion, it stated that "the lithographic plates manufactured by Advance Offset Plate, Inc. and the process utilized in said manufacture do infringe United States Letters Patent No. 3,181,461 issued to plaintiff Howard A. Fromson ..." Nonetheless, the court concluded that "defendant is not liable to plaintiff for infringement because Patent No. 3,181, 461 is invalid for obviousness," and further held that this case did not present "exceptional circumstances" under 35 U.S.C. § 285 warranting an award of attorney fees to Advance.

In deciding the question of "whether a patent is invalid for obviousness," the court said it must consider the differences inquiry mandated by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

The Fromson Patent is a combination patent comprised of old elements. The use of aluminum as a substrate in printing is old art. The forming of oxide coatings on aluminum, whether by anodization or other means, was old art. The use of alkali metal silicates, especially sodium silicate, in conjunction with an aluminum base sheet and the subsequent coating with diazo resins was old art with the Jewett patent. The use of light-sensitive coatings generally in lithography was old art. The only difference between the Fromson Patent and the pri-

or art ... is that the Fromson Patent combines anodization, silication, and application of a sight-sensitive substance into one process. The advantage of the Fromson process is that the oxide layer protects the aluminum base from corrosion, giving it much longer press life, while the silicate layer provides an insoluble, hydrophilic surface that acts as a good anchor for the light-sensitive compound.

The district court said the level of ordinary skill in the art when the invention was made (1963) "was quite advanced," and would require at least a bachelor's degree in chemistry and some years' experience in the lithography field.

The court rejected Fromson's argument that his invention achieved unexpected results (based on a "failed" experiment reported in the prosecution history of U.S. Patent 2,507,314 to Mason and asserted to have taught away from his invention because it taught that anodized and silicated aluminum had no ink or water-holding characteristics). The court thought Mason did not necessarily teach away because its failure would have "surprised" one skilled in the art. The court considered other failed attempts to adapt anodized aluminum to lithographic printing irrelevant because they did not use silication.

The court discounted evidence of commercial success and licenses, under which "many millions of pounds of anodized and silicated plates" were sold each year, because the invention's success "is not due to any unobvious improvement over existing technology, but rather is a function of the development of coil anodization, which is a cheaper way of anodizing than the old batch anodization, which is labor intensive and expensive."

While recognizing that the Examiner had before him the references Advance relied on, the court said the Examiner's analysis of the prior art was "cursory".

The district court concluded:

"The Jenny reference teaches anodization techniques in depth and stresses the importance of sealing the oxide layer to prevent corrosion. The Mason Pat-

ent '314 and the Jenny reference make obvious successive anodic and silicate treatments. The Jewett Patent discloses the compatibility between diazo and a silicate compound. Finally, the Belgian Patent teaches anodization followed by silication followed by application of a photosensitive layer. These references make the Fromson invention obvious to one of ordinary skill in the art. The secondary considerations Fromson cites do not and cannot make the Fromson Patent valid.

In a July 30, 1984 post-judgment order, the court ordered entry of final judgment in favor of Advance. In an August 3, 1984 post-judgment stipulated order, the district court provided that its opinion and final judgment "shall have equal force and effect as if entered in all of the consolidated civil actions against Advance's customers." The court declined to enter judgments in those actions, noting the parties' agreement that a decision on appeal would bind all parties to all consolidated actions.

### Issues Presented

*Appeal No. 84–1542:* Whether the district court erred in holding that the subject matter claimed in the Fromson patent would have been obvious to one skilled in the art at the time the invention was made. 35 U.S.C. § 103.

*Cross-Appeal No. 84–1553:* Whether the district court erred in holding that Advance infringed Claims 1, 4, 6, 7, 12, and 16 of the Fromson Patent.

### OPINION

*Appeal No. 84–1542*

*Standard of Review*

Fromson says "a determination of obviousness is one of law and is subject to full and independent review by this Court," citing *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1457–58, 221 USPQ 481, 485 (Fed.Cir. 1984). Advance says that "the lower Court's decision as to obviousness must be upheld unless it is shown to be clearly

erroneous," citing *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 221 USPQ 1025 (Fed.Cir.1984). Neither completely states the law.

■ As the appellant, Fromson bears the burden here of showing either that the district court in deciding the question of obviousness committed reversible legal error, or that its probative findings underlying the conclusion on obviousness were clearly erroneous. *Atlas Power Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1573 (Fed.Cir.1984). Whatever Fromson may have meant by "full and independent review," it cannot mean that this court may proceed as though there had been no trial. The legal error Fromson must show must have been so fundamental as to require reversal or remand. The findings Fromson must show to have been erroneous must also be fundamental, i.e., so critically required to support the legal conclusion that their collapse would preclude arrival at that conclusion. Whether Fromson's attack be directed to the trial court's conclusion or to its findings, it is necessarily restricted to the record made at trial.

Advance's reference to "clearly erroneous" implies that the district court's "decision as to obviousness" is a fact finding subject to Fed.R.Civ.P. 52(a). This court settled the conflict concerning the nature of the obviousness "decision" in *Gardner v. TEC Systems, Inc.*, 725 F.2d 1338, 1344, 220 USPQ 777, 782 (Fed.Cir.1984) (in banc), wherein this court said the ultimate conclusion on obviousness was just that, a legal conclusion. Like all legal conclusions, that on obviousness must be based on facts established in the record. Those underlying fact findings are on review subject to the "clearly erroneous" standard, and findings suffering that infirmity may be so critical as to undermine the legal conclusion of obviousness, but that is not to say that the ultimate decision (conclusion) is measured by that standard.

1. Courts should not declare patents valid. There is never a need or occasion for such a declaration. Patents are born valid and remain so until proven otherwise. In a proper case,

### Presumption of Validity

■ Sounding as though he bore a burden of proving validity, Fromson says "the presumption of validity (35 U.S.C. § 282) in this case has been strengthened ... by the fact that the PTO in the Reissue Proceeding embraced and considered all of the prior art and other evidence brought forth" at trial. Fromson's position should be stated as "Advance's burden of proving invalidity was made heavier" by that circumstance.[1] The district court properly concluded that the presumption, like all legal presumptions, "is static—that is, it can neither be strengthened or [sic] destroyed." The presumption of validity under § 282 is a procedural device, placing the burden of proving invalidity on the party asserting it. It is not substantive law. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 at 1534, 218 USPQ 871 at 875 (Fed.Cir.1983).

■ The Examiner's decision, on an original or reissue application, is never binding on a court. It is, however, evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence. *See American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359–60, 220 USPQ 763, 770 (Fed.Cir. 1984). We are satisfied that the district court did not disregard the presumption here.

### 35 U.S.C. § 103 Obviousness

Fromson attacks the language employed by the district court as (1) disparaging the '461 patent as a "combination patent"; (2) reflecting a "hindsight analysis"; (3) emphasizing an "each-element-is-old" factor; (4) focusing only on the difference from the prior art instead of viewing the invention as a whole; (5) denying deference to the PTO Reissue Proceedings; and (6) disregarding secondary considerations.

courts should find that "the party challenging validity failed to carry its burden under § 282." Where that burden is carried, courts should declare the patent invalid.

■ Much of Fromson's attack on the district court's language fails to comprehend the appellate function. This court reviews judgments, not opinions. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1540, 218 USPQ at 880. Mere misstatements of law in an opinion, unfortunate as they always are, do not in themselves conclusively establish that the appealed judgment was founded on legal error requiring reversal of that judgment or remand for a new trial. Yet it is also true that "the language in an opinion, or in a set of findings and conclusions, may indicate that numerous harmful errors of law produced an erroneous conclusion ..." *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d at 1458, 221 USPQ at 485. The present is such a case.

### Fundamental Error

The basic error of law extant here lies in the district court's evaluation of the claimed invention. That evaluation is reflected in the court's statement that the difference between the Fromson invention and the prior art "is that the Fromson patent combines anodization, silication, and application of a light-sensitive substance into one process." At no point did the court indicate, nor does the record indicate, a basis on which it can be said that the making of that combination would have been obvious when it was made.

■ In a statement conceded by Advance to have been "perhaps unfortunate," the district court characterized the '461 patent as "a combination patent comprised exclusively of old elements."[2] That each "element" was old at the time the invention was made was undisputed in the PTO, at trial, and before this court. There is no basis in the law, however, for treating combinations of old elements differently in determining patentability.[3] *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1540, 218 USPQ at 880.

The critical inquiry is whether "there is something in the prior art as a whole *to suggest* the desirability, and thus the obviousness, of making the combination." *Lindeman Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d at 1462, 221 USPQ at 488 (emphasis added).[4]

■ Where, as here, nothing of record plainly indicates that it would have been obvious to combine previously separate process steps into one process, it is legal error to conclude that a claim to that process is invalid under § 103.

Advance asks us to hold that the district court intended to say the prior art as a whole, would have suggested[5] the invention to one of ordinary skill in the art. Advance cites nothing in the court's memorandum on which such a holding might rest, and the evidence of record convinces us that any such intent, if it ever existed, would have been unfounded.

### Secondary Considerations

This court has stated that evidence of secondary considerations must always when present be considered in the process of determining obviousness, and that it "may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious was not." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538, 218 USPQ at 879.

■ The district court's memorandum opinion contains the statement that:

2. The quoted statement repeats verbatim language in Finding 18 which this court found irrelevant in the first appeal. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d at 1570, 219 USPQ at 1141.

3. "Only God works from nothing. Men must work with old elements." Markey, *Why Not the Statute,* 65 JPOS 331 (1983).

4. It is undisputed that the district court correctly determined the scope and content of the prior art and level of skill, in its application of *Graham v. John Deere,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 515 (1966). The dispute centers on its evaluation of the differences between the claimed invention and the prior art.

5. Actually, Advance used "would suggest," as though the invention were being made now.

evidence of secondary considerations is not conclusive on the issue of obviousness, *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 740 (Fed.Cir.1984), and if this Court determines from the first three factual inquiries that Fromson's patent is [sic, invention would have been] obvious, secondary considerations cannot fill the gap. *Anderson's Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61 [90 S.Ct. 305, 308, 24 L.Ed.2d 258] (1969).... The secondary considerations Fromson cites do not and cannot make the Fromson patent valid.

In that statement the district court misread this court's holding in *Leinoff.* There, the party asserting invalidity argued that "long-felt need" was a *requirement* for non-obviousness. This court rejected that view. Recognizing the Supreme Court's listing in *Graham v. John Deere* of secondary considerations as probative indicia of non-obviousness, this court said such evidence "is not *necessarily* conclusive." (Emphasis added). Requiring consideration of all evidence probative of a question is not the same as requiring that particular evidence must be controlling. Nor is such a requirement inconsistent with language appearing in *Anderson's-Black Rock, supra.* Objective evidence ("secondary considerations"), such as commercial success due to the merits of the invention, must when present be considered as part of the obviousness equation. The district court erred here in reaching a conclusion on obviousness before considering the evidence of secondary considerations, and in then evaluating the latter solely on its "gap filling" capacity.

*Commercial Success*

The evidence establishes that Fromson's corporation, Ano-Coil, having entered the newspaper market in 1975, supplied more than 500 newspapers by the year 1982, produced an average 5 to 7 *million* pounds of plate per year, with an average dollar volume per year of $10 to $12 million. The record further discloses four independent licensees by 1982 (3M, Jakvin, Warren, and Richardson) producing between 14 and 16 million pounds of plate per year, and five alleged infringers (Advance, Citiplate, Imperial, RBP, and Western) producing between 23 and 26 million pounds of plate per year.

The district court said "the success of Fromson's plate is not due to any unobvious improvement over existing technology, but rather is a function of the development of coil anodizing, which is a cheaper way of anodizing than the old batch anodization, which is labor intensive and expensive." That statement was based on testimony of Advance's expert Hodgins, who said the admitted commercial success of Fromson's invention "depends greatly upon the anodizing in coil form—the ability to take a continuous web of aluminum foil or a plate and run it through in a continuous basis through the anodizing and silicating."

■ Hodgins' opinion testimony is not supported by the record, which contains no indication of the relative costs of producing anodized aluminum plate by coil anodizing and by batch anodizing. Assuming, *arguendo,* that a difference in production costs existed, no evidence of record supports an inference that the difference would have been such as to have rendered obvious the claimed invention.

■ On the contrary, the undisputed evidence of record establishes that: Fromson began to practice coil anodization in 1957; he made the claimed invention in 1963; and the '461 patent issued May 4, 1965. The revolutionary, market-dominating properties of Fromson's long-run printing plate are undisputed. It is at best bizarre to assert that the subject matter claimed in the '461 patent was merely, as Hodgins says, an obvious extension of coil anodizing technology when none skilled in the art attempted such "extension" during the seven years when the alleged economic advantages of coil anodizing were publicly available.

Hodgins' "explanation" of why one skilled in the art never applied the alleged teaching of the Mason patent is significant:

Q. Mr. Hodgins, how is it you never applied the lithographic anodizing tech-

niques to the plate that you were working with at the time?

A. ... We already had been using a brush-grained surface provided by John Stark Laboratories and we were not convinced that the anodizing of aluminum would be an economic advantage.

Hodgins' testimony, in its indication that those skilled in the art did not recognize the revolutionary properties of an anodized and silicated plate, aids Fromson. Further, it is not insignificant that Hodgins, who claims now to have been "aware of" the possible application of an anodized and silicated aluminum plate to lithography and of coil anodizing as early as 1957, never developed (or even experimented with) the subject matter of the '461 patent.

*Prior Failures*

■ The "failed" experiment reported in the prosecution history of the Mason patent renders that patent irrelevant as a prior art reference. As stated by Judge Learned Hand, "another's experiment, imperfect and never perfected will not serve either as an anticipation or as part of the prior art, for it has not served to enrich it." *Picard v. United Aircraft Corp.*, 128 F.2d 632, 635, 53 USPQ 563, 566 (2d Cir.1942), *cert. denied*, 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942).

*The Reissue Proceeding*

The exhaustive consideration given the prior art by the PTO during reissue must be weighed in determining patentability. As this court said in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*:

When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

725 F.2d at 1359, 220 USPQ at 770.

Advance urges that we read between the lines of the district court's opinion to find an unspoken belief of that court that the Reissue Proceeding was legally and factually flawed. Advance says its witnesses Fishman and Hodgins demonstrated that the Examiner lacked experience and knowledge of the law governing reissue proceedings and points to a deposition in which it sought to test the Examiner's skill in the art. Because the district court declined to follow Advance's line of attack, we need not discuss the irrelevancy of those assertions.

The judgment that the '461 patent is invalid must therefore be reversed.

*Cross-Appeal No. 84–1553*

■ Repeating assertions found meritless in an earlier appeal to this court, Advance argues that the district court erred in finding infringement of claims 1, 4, 6, 7, 12, and 16 of the '461 patent. Advance says that the "crux" of Fromson's invention was in the "reaction product," that the "reaction product" does not encompass a precipitation of silica, that Fromson has in fact disclaimed a mere "covering", such as a precipitation of silica, during prosecution of the '461 patent, and "that the 'precipitation of silica' has been unquestionably shown to be the mechanism which Fromson employs in the manufacture of its printing plates ..."

Advance vigorously attacks the district court's finding on infringement of claim 4, stating that claim 4 is limited to "a polyvinyl alcohol containing a light sensitive agent of the class consisting of ... bichromate," and that the district court erred by reading the broader limitations of claim 6 (with respect to formation of the plate's oxide coating and the light-sensitive agent employed) into the narrower limitations of claim 4. Advance claims that Fromson did not show that Advance or its customers used a polyvinyl alcohol.

Fromson states that claim 4 is infringed under the doctrine of equivalents, that the water-soluble, light-sensitive coating of claim 4 is the functional equivalent of the water soluble, light-sensitive diazo resin coating of claim 6, that Advance literally infringes claim 6, and that Advance introduced no evidence establishing non-equivalence between the light sensitive coatings of claim 4 and claim 6.

We find without merit Advance's repetition of issues settled in the prior appeal. On remand, the district court was required to find whether Advance's plates "have a layer that is water insoluble, hydrophilic *and* organophobic". The district court so found and Advance has not established clear error. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951 at 956, 220 USPQ 592 at 596 (Fed.Cir.1983).

The judgment that claims 1, 4, 6, 7, 12, and 16 of the '461 patent were infringed must therefore be affirmed.

*Reversed in part, Affirmed in part.*