**E.I. du PONT de NEMOURS & COMPANY, Plaintiff,**

v.

**POLAROID GRAPHICS IMAGING, INC., Defendant.**

**Civ. A. No. 88–235 JRR.**

United States District Court, D. Delaware.

Feb. 17, 1989.

Richard L. Sutton and Jack B. Blumenfield of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. of counsel: Joseph M. Fitzpatrick and Henry J. Renk of Fitzpatrick, Cella, Harper & Scinto, New York City and Robert C. Kline, James A. Forstner and Annette L. Richter of E.I. du Pont de Nemours & Co., Wilmington, Del., for plaintiff.

Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del. of counsel: Frank P. Porcelli, John M. Skenyon, Charles Hieken and John R. Schiffhauer of Fish & Richardson, Boston, Mass., for defendant.

## OPINION

ROTH, District Judge.

The plaintiff in this action, E.I. du Pont de Nemours & Company ("Du Pont"), charges the defendant, Polaroid Graphics Imaging, Inc. ("Polaroid"), with infringement[1] of Du Pont's United States Patent No. 4,053,313 issued in the name of Roxy N. Fan (the "Fan patent") by its Spectra color proofing process. Presently before the Court are two motions: Du Pont's motion for a preliminary injunction against Polaroid's infringement of the Fan patent and Polaroid's cross motion for partial summary judgment based on its assertion that the principal claims of the Fan patent are completely anticipated under 35 U.S.C. section 102(a) by United States Patent No. 2,403,225 issued in the name of Harold B. Law (the "Law patent").

## I. FACTS

A. *The Fan Patent.* The Patent and Trademark Office (the "PTO") issued the Fan patent, entitled "Process for Image Reproduction Using Multilayer Photosensitive Solvent Processable Elements," on October 11, 1977. The multilayer element claimed by the Fan patent includes a bottom sheet support, a middle adhesive elastomeric layer (the "tacky" layer) that is tonable but that is not photosensitive, and a top layer that is photosensitive and that is solvent-processable after exposure to light. Fan Patent at Column 8.

Although the claims of the Fan patent are broadly worded to encompass image reproduction in general, *id.* at Column 1 & 8, examination of the patent as a whole makes it clear that the patent was directed to the process of making a color proof. For example, two of the three examples listed in the specification relate to making a color proof.[2] *Id.* at Columns 5–8. Specifically, the first example teaches how to

make "a positive working color proof of the overlay type" and the third example teaches how to make "a negative working color proofing material." Both examples provide detailed steps as to how to construct an overlay color proof and the three-layered element described in the patent is appropriate for use as color proof film in the color proofing industry. *Id.* at Columns 6–8. Additionally, the prior art cited relates to the color proofing field. *Id.* at Column 1.

The basic image reproduction process of the Fan patent reproduces images by one of two methods: either a positive working or a negative working method. The only difference between the two methods is whether the top photosensitive layer becomes solvent-insoluble after exposure to light (a positive working system with a photohardenable layer) or whether this layer becomes solvent-soluble after exposure to light (a negative working system with a photosoluble layer). Using either method, an image in the form of a film with clear and darkened areas is placed over the three layer element on top of the photosensitive layer and light is shined on the film. This results, depending on which process is used, in certain areas being solvent-soluble and others being solvent-insoluble. After the film is removed, the photosensitive layer is washed with solvent to remove the solvent-soluble material and expose the tacky layer underneath. With the top of the layer now having tacky areas and solvent-insoluble areas that are not tacky (corresponding to the image on the film that was placed over the top), toner is applied, it adheres to the tacky areas, and the image is made visible.

When making a color proof using the Fan patent process, four of the three-layered elements are laminated together to produce a color proof.[3] First, a picture is

1. Du Pont alleges that Polaroid infringes its Fan patent under 35 U.S.C. § 271(b) and (c) "because of its active inducement and contribution" to the direct infringement by Polaroid's customers. *See* Plaintiff's Opening Brief at 23 (D.I. 10).

2. The other example provided in the patent described how to make "a printed circuit on a

copper-clad epoxy board." Fan Patent at Column 7.

3. Thus, laminating these sheets together is the only step not contained in the patent claims that is necessary to obtain a useful product from the teachings of the patent.

separated out into three colors (red, blue, and green) and black. To do this in a negative working system, a negative transparency of a picture is exposed through four different filters. When the negative transparency is exposed through a red filter to light from a full color original, the resulting negative transparency is called a red separation. Separating a picture into its component colors by this process results in four separations corresponding to the three colors and black.

After making the four separations, four different pieces of color proof film are exposed to light through the specific separations, one piece per separation. Solvent is applied to the film, washing off the solvent-soluble areas and exposing the underlying tacky film. The appropriate pigment is then applied in accordance with the way in which colors combine. When a sheet of color proofing film is exposed to light through a red separation, cyan colored pigment is applied; when a blue separation is used, yellow pigment is applied; when a green separation is used, a magenta pigment is applied; and when a black separation is used, black pigment is applied. These four color proof films are then laminated together and when so combined, a full color picture results. See Affidavit of Dr. Uhlman, ¶¶ 6–10, Exhibits C–J (D.I. 11).

Color proofing is an important part of the graphic arts industry because it provides an inexpensive check on the quality of the color separations. The color separations used in this process are the same ones that are used in making the printing plates for the final printing. However, because making printing plates used in the final printing is more expensive than the color proofing process, it is possible to reduce expenses by making adjustments to the color separations at the color proofing stage rather than after the printing plates are made. The ability of a color proofing process to reproduce colors accurately is thus highly prized.

B. *The Law Patent.* The PTO issued the Law patent, entitled "Method of Manufacturing Electrode Foundation Structures," on July 2, 1946. The Law patent discloses a three layer element consisting of a thin glass bottom sheet support, a middle adhesive layer (a "tacky" layer) that is not photosensitive, and a top layer that is photosensitive and that is solvent-processable after exposure to light. Law Patent at Column 3 & 7.

The claims of the Law patent are worded very specifically to apply to the manufacture of foundations for electrode structures. *Id.* at Column 6–8. In fact, every claim except claim 6 contains either the phrase "foundation for an electrode structure" (claims 1 & 2), or "electron foundation structure" (claims 3–5 & 7).[4] Moreover, the Law patent limits its application in its specification "to television transmitting tubes and electrode structures and more particularly to improved methods of manufacturing target structures suitable for use in tubes of the low velocity electron beam scanning and electron image types." *Id.* at Column 1. Both examples provided in the patent relate to the production of a electrode foundation structure.

The basic image reproduction process of the Law patent begins as a positive working system—areas on the top photo-sensitive layer becomes solvent-insoluble after exposure to light. Like the Fan patent, the Law patent teaches that an image in the form of a film with clear and darkened areas (in the Law patent the image, appropriate for electrode foundations, consists of a pattern of small dots) is placed over the three layer element on top of the photosensitive layer and light is shined on the film. The Law patent then teaches that after the film is removed and the top layer is washed to remove the areas where it remains solvent-soluble, very fine particles of silicon carbide are applied and adhere to the exposed tacky areas. Then the entire layer is baked to "burn off" the top two layers and to develop bubbles in the glass support sheet under the areas where the silicon

---

4. Claim six applies to the manufacture of "a target electrode member." Law Patent at Column 7–8.

carbide has been applied. The silicon carbide acts as a resist, focusing heat from the oven onto the specific areas on the glass where it has been applied. Law Patent at Column 7. The layer is then immersed in an acid solution to wash out and remove the silicon carbide and expose the holes or depressions in the glass corresponding to the bubbles, where the silicon carbide was located, depending on how long the glass was baked and how long it is left in the acid solution. *Id.* at Columns 5 & 7–8. The image left on the bottom sheet support, which corresponds to the dots on the film, is no longer made visible by the presence of the silicon carbide.

The glass sheet, with either depressions or holes in it, is not useful in this form. To act as an electrode foundation structure, the specification of the patent describes how to fill in these apertures with metal to create the necessary structure of a glass sheet containing uniformly spaced metal plugs. *Id.* at Columns 5–6. Uniform spacing of the metal plugs in the glass foundation is important in the manufacture of electron beam tubes because "without a symmetrical array of recesses or apertures the degree of resolution ... is not as high as desired and cannot be maintained uniform from tube to tube." *Id.* at Column 1. Thus, a process, like the Law process, that provides uniform spacing of the metal plugs that can duplicated with a high degree of accuracy, is highly desirable.

C. *The Reexamination of the Fan Patent.* A number of events led to Du Pont submitting the Fan patent to the PTO for reexamination to confirm the patentability of the claims contained therein. First, in September of 1980, Keuffel & Esser Company ("K & E"), the company that originally developed the Spectra color proofing process that Polaroid uses, provoked an interference pursuant to 35 U.S.C. section 135

with Du Pont for rights to the process contained in K & E's Spechler patent application and to the process in the Fan patent. K & E and Du Pont litigated this issue for three years, and in July of 1983 Du Pont was awarded the patent rights. By this time, K & E had been purchased by another company and this company soon was suffering from financial difficulties. Then, a few years later, in 1985, Sage Technology, Inc. ("Sage") purchased the Spectra Color Proofing System from K & E's owner, at which time Du Pont contacted Sage and informed it of the existence of the Fan patent. Actually, this contact did not provide any new information to Sage as there was a paragraph in the purchase agreement notifying Sage of the existence of the "Du Pont Patent Matter" that specifically referred to the Fan patent. Exhibit N at 6961 ¶ 8.05, Appendix to Plaintiff's Reply Brief (D.I. 41A). At the time that Sage acquired the Spectra process, Polaroid owned about an eighteen percent interest in Sage.

Next, in November of 1985, Polaroid purchased the remainder of Sage. It was at this time that somewhat regular contact commenced between Du Pont and Polaroid.[5] Based on Polaroid's insistence that the Fan patent was invalid, and Du Pont's position that it was valid, Du Pont filed a Request for Reexamination of the Fan patent with the PTO on March 19, 1987. This request contained all the prior art, including the Law patent, that Polaroid had cited to Du Pont as the basis for its position that the Fan patent was invalid. On November 3, 1987, the PTO Issued a Reexamination Certificate confirming the patentability of all claims in the Fan patent over the prior art included in the request. Specifically, the examiner stated that "[a]ll of the references cited by the patent owner and Requester ... have been considered. How-

---

5. The first contact between Du Pont and Polaroid occurred at this time, just after Polaroid purchased the remaining interest in Sage in November of 1985; the two sides first met in February, 1986; Polaroid sent Du Pont a communication regarding the Fan patent in May, 1986; Polaroid cited prior art references to Du Pont in August, 1986; Du Pont informed Polaroid of its position that the Fan patent was valid

in January, 1987; the Reexamination process took place between March 19, 1987 and February 25, 1988; Du Pont notified Polaroid that the PTO upheld the validity of the patent in March, 1988; Du Pont met with Polaroid on March 30 and April 22, 1988; Du Pont filed suit against Polaroid on May 6, 1988; and Du Pont filed its motion for a preliminary injunction on June 23, 1988.

ever, the Examiner can find *no suggestion* within this body of prior art which would enable one having ordinary skill in the art to combine the references to arrive at the claimed invention." Exhibit H at 222, Appendix B to Defendant's Answering Brief (emphasis added) (D.I. 33B).[6] On December 3, 1987, Du Pont submitted a second Request for Reexamination seeking clarification of the PTO examiner's reasons for confirmation of the claims. In this second request, Du Pont again specifically identified the first embodiment of the Law patent, which the defendant claims anticipates the Fan patent. The PTO denied this request on February 25, 1988, as raising "[n]o substantial new question of patentability" and incorporated by reference the reasons for confirmation contained in the original Reexamination Certificate.

## II. ANALYSIS

For Polaroid to succeed on its motion for partial summary judgment, it must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Avia Group International v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988); *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1260 (Fed.Cir.1985); *Friction Division Products, Inc. v. E.I. du Pont de Nemours & Company*, 693 F.Supp. 114, 120–21 (D.Del.1988). This would require Polaroid to produce clear and convincing evidence that the Fan patent is invalid. Polaroid has chosen to attack the Fan patent solely on the grounds that it is anticipated by the Law patent under 35 U.S.C. section 102(a) and that any differences between the Fan patent and the Law patent appearing in claims 4 and 8 of the Fan patent are rendered obvious by the Law patent. *See* Defendant's Answering Brief at 43 (D.I. 33); Transcript of December 12,

1988, Oral Argument at 23 [hereinafter Transcript] (D.I. 46).

Du Pont must satisfy the traditional standards applicable to preliminary injunctions to succeed on its motion. As the Court of Appeals for the Federal Circuit stated in *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446 (Fed.Cir.1988):

[T]o obtain a preliminary injunction, pursuant to 35 U.S.C. § 283, a party must establish a right thereto in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest.

These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.

*Id.* at 1451 (footnotes omitted). *See also T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equipment, Inc.*, 821 F.2d 646, 647 (Fed.Cir.1987); *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987); *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1269 (Fed.Cir. 1985). Thus, for Du Pont to succeed on its motion it must show a reasonable likelihood of success on the merits. To do this, Du Pont must show that there is a reasonable likelihood that at trial Polaroid will not prevail on the invalidity defenses that it has chosen to advance. More specifically, Du Pont has to show by a preponderance of the evidence both that Polaroid will fail to meet its burden of proving, by clear and convincing evidence, that the Fan patent claims are invalid because they are anticipated by the Law patent, *H.H. Robertson*, 820 F.2d at 387, and also that Polaroid infringes the Fan patent.

---

**6.** After the issue of the Reexamination Certificate, DuPont filed a Rule 312 amendment to clarify that the Examiner had considered both the first and second embodiments of the Law patent. In this amendment, Du Pont directed the Examiner to the first embodiment of the Law patent and stated, "It is possible, by laying the Law patent and the Fan patent side by side, to ferret out certain similarities.... Requester submits that *neither of the two embodiments in the Law patent* renders obvious any of the claims undergoing reexamination...." Exhibit I at 227, Appendix B to Defendant's Answering Brief (emphasis added) (D.I. 33B). The amendment was refused as not procedurally proper. DuPont then filed its second Request for Examination.

Thus, we first examine Polaroid's claim that the Fan patent is anticipated by the Law patent. If Polaroid can show by clear and convincing evidence that the Fan patent is anticipated by the Law patent and therefore invalid, then: (1) Du Pont's motion would be denied because it would have failed to show that there is a reasonable likelihood that Polaroid would fail on its chosen invalidity defenses; and (2) still assuming that there are no genuine issues of material fact, Polaroid's motion for partial summary judgment would be granted, Polaroid having provided evidence showing that it is entitled to judgment as a matter of law.

■ A. *Validity of the Fan Patent.* All patents are presumed valid. 35 U.S.C. § 282. Each claim of a patent is presumed valid independent of the validity of the other claims. *Id.* Thus, the burden clearly rests upon Polaroid to prove by clear and convincing evidence that the Fan patent is invalid. *See, e.g., Friction,* 693 F.Supp. at 121. Moreover, because the PTO issued a Reexamination Certificate, Polaroid's burden is more difficult to satisfy, especially because all the prior art upon which it bases its anticipation defense, including the Law patent, was before the examiner at both the original and the reexamination proceeding. *Custom Accessories, Inc. v. Jeffrey–Allen Industries, Inc.,* 807 F.2d 955, 961 & n. 22 (Fed.Cir.1986); *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1558 (Fed.Cir.1985). Indeed, with respect to a reissue procedure,[7] the court in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), stated:

When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the

added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*Id.* at 1364. Further, because it is standard practice for the PTO to broadly interpret claims during examination and reexamination procedures, 1 P. Rosenberg, *Patent Law Fundamentals* § 7.04 at 7–16 (2d ed. 1988), Polaroid faces the burden of showing that the PTO failed to perform its normal functions in the initial proceeding and the reexamination proceeding. Thus, although the presumption of validity is merely a procedural device, *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equipment, Inc.,* 821 F.2d 646, 648 (Fed. Cir.1987), which is not strengthened by reexamination, *id.,* "the exhaustive consideration given the prior art by the PTO during [reexamination] [8] must be weighed in determining patentability." *Fromson,* 755 F.2d at 1558. Finally, it is well-established law that courts should if possible construe patents to uphold validity. *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 749 (Fed.Cir.1987) (citing *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1577 (Fed.Cir.1984)), *cert. denied,* —— U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988)).

■ An invention is anticipated only if each element of the claimed invention is disclosed in a single prior art reference. *Id.* at 747; *Studiengesellschaft Kohle mbH v. Dart Industries, Inc.,* 726 F.2d 724, 726–27 (Fed.Cir.1984), *aff'g* 549 F.Supp. 716 (D.Del.1982); *Friction,* 693 F.Supp. at 122;

**7.** Although generally a reissue procedure is more extensive than a reexamination procedure, *see, e.g., Dresser Indus. Inc. v. Ford Motor Corp.,* 530 F.Supp. 303, 305–06 (N.D.Tex.1981), that difference is not relevant here where Polaroid's only argument is that the Fan patent is anticipated by the Law patent because the reexamination procedure focuses on patents and printed publications. 35 U.S.C. §§ 302–307; 37 C.F.R. § 1.552(a)–(c). If Polaroid had raised addition-

al arguments not based on issued patents, then the difference between a reissue procedure and a reexamination procedure might have become significant.

**8.** Although the original quote referred to a reissued patent, under 35 U.S.C. § 307(b) a reexamined patent's claims have the same effect as a reissued patent's claims. *See also supra* note 7.

1 E. Lipscomb III, *Lipscomb's Walker on Patents* § 4:4 at 270 (2d ed.1985). As the court stated in *Perkin Elmer Corp. v. Computervision, Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984): "[T]here is no anticipation 'unless all of the same elements are found in exactly the same situation and united in the same way ... in a single prior art reference.'" Thus, anticipation is a narrow technical defense that should be strictly applied. *Studiengesellschaft*, 549 F.Supp. at 723; 1 P. Rosenberg, *supra* p. 12, § 7.04 at 7–14, 7–16; 1 E. Lipscomb, III, *supra* p. 13, § 4:4 at 275 (citing in Supp. *B.W.B. Controls, Inc. v. U.S. Industries, Inc.*, 626 F.Supp. 1553 (E.D.La.1985), *aff'd mem.*, 802 F.2d 471 (Fed.Cir.1986)). It follows therefore that any degree of physical difference, however slight, invalidates claims of anticipation. 1 P. Rosenberg, *supra* p. 12, § 7.04 at 7–14.

■ Applying this standard of anticipation to the Fan and Law patents, it is clear that the Law patent does not anticipate the Fan patent. Both patents reproduce images, but by different processes. The patents are similar in that both processes use, in general terms, a sheet support, an adhesive elastomeric layer, and a solvent processible photosensitive layer. It is also true that the first several steps of the two patents are similar, if not identical.[9] For the purpose of this analysis, however, the major difference is that in each of the Law patent's seven claims, after application of the silicon carbide, the following steps appear: (1) heating or baking the foundation; (2) to a softening temperature; (3) to develop bubbles underlying the particles of silicon carbide retained on the exposed portions of the emulsion film. Law Patent at Columns 6–8. After these steps, Law states, "I immerse the sheet in a hydrofluoric acid solution *which loosens and dissolves the silicon carbide particles....*" *Id.* at Column 5 (emphasis added). Thus, the silicon carbide which is applied to the layered sheet is not present at the conclusion of the Law image-reproduction process. The image that is formed by applica-

tion of the silicon carbide in the Law patent is only an intermediate image that no longer exists at the conclusion of the Law image-reproduction process. By contrast, the image that is formed by application of the toner in the Fan patent is the final image that is sensed at the conclusion of the Fan image-reproduction process. We find this difference sufficient to preclude a finding of anticipation using this standard, because Law does not teach application of a particulate matter or toner that is present at the conclusion of an image-reproduction process and that makes a final image sensible.

■ Even though anticipation is a technical defense that should be applied according to strict standards, every claim of the alleged anticipated patent need not appear within the "four corners of the asserted anticipatory reference." *Studiengesellschaft*, 549 F.Supp. at 724. Applied to the present case, the *Studiengesellschaft* court's reasoning can be summarized as follows: "If, from the text of the [Law patent, one] could 'practice the invention [of the Fan patent] without having to depend on the [Fan] patent or his inventive skills,' then the [claims in the Fan patent] will be anticipated." *Id.* at 725 (quoting *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, 544 (3d Cir.1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977)). This reflects the idea that:

> [P]rior art may anticipate when complete anticipation requires only that one skilled in the art merely exercise that skill to complete the work. Thus, a reference may be used to anticipate not only for what it directly teaches but also for what it suggests to a person of ordinary skill in the art.

1 E. Lipscomb III, *supra* p. 13, § 4:4 at 271. Thus, we must determine whether Polaroid has proved that one skilled in the art, by applying his or her normal skills, would be able to create the image-reproduc-

---

9. We ignore here the differences between toner and "very fine particles of silicon carbide" on which the plaintiff relies in its attempt to per-

suade the Court that the Law patent does not anticipate the Fan patent. *See* Plaintiff's Reply Brief at 10–16 (D.I. 41).

tion process that the Fan patent claims from the image-reproduction process that the Law patent discloses.

Polaroid has produced no evidence that a person skilled in the art could, after examining the Law patent, create images in the manner that the Fan patent claims without reference to the Fan patent or without resort to his or her inventive skills. Polaroid's argument that the Fan patent was anticipated by the Law patent focused on two related issues: (1) whether application of particulate silicon carbide was toning; and (2) whether silicon carbide is a toner. We do not need to address the general question of whether silicon carbide is a toner or whether it is possible for it to be used as a toner. In order to determine whether invention was required to go from the teachings of Law to the claims in Fan, we examine instead whether silicon carbide, as used in the Law patent, was used as a toner in a toning process.[10]

Whether silicon carbide is suitable for use as a toner and whether dusting of silicon carbide as taught by the Law patent is toning has been hotly contested in these motions. Most of the argument has centered around whether silicon carbide is the appropriate size and color to be classified a toner and whether its characteristics make it appropriate for use as a toner. Exactly what is meant by "toning" and "toner," however, has not received proportional attention. Michael H. Bruno, one of Polaroid's experts, stated during his deposition that a toner "is a material that is used to make an image visible and colored.... [Toning] doesn't form an image. It makes the image visible." Bruno Deposition, Appendix to Plaintiff's Reply Brief, at 26 (D.I.

41A). Du Pont raised this argument again at oral argument arguing that toner, as used in the Fan patent, makes an image visible and colored; by contrast, the silicon carbide, as used in the Law patent, forms an image. Transcript at 8. Polaroid, it appears, was at a loss to refute this argument because it offered no evidence to the contrary either in its briefs or at oral argument. Reviewing all of the evidence, we agree with the definition of toning and toner offered by Bruno. Using this definition, the Law patent's use of silicon carbide cannot be termed toning and the silicon carbide cannot be termed a toner. The silicon carbide forms an image which, at the conclusion of the Law image-reproduction process, no longer consists of silicon carbide. That process is not within the definition of toning. The silicon carbide, putting to the side the disputed question of whether a toner must have color, does not make the image visible at the conclusion of the Law process. Silicon carbide, as used in the Law process, is not within the definition of toner.

Because silicon carbide as used in the Law process was not used as a toner in a toning process and because Polaroid has failed to introduce any evidence that application of a toner, instead of silicon carbide in the Law patent, to the middle tacky layer did not require invention, we find that Polaroid has failed to produce clear and convincing evidence that the Fan patent is anticipated by the Law patent and therefore invalid.

■ For all of the foregoing reasons we hold that Polaroid has failed to prove that the Fan patent is anticipated by the Law patent.[11] This, of course, means that Po-

10. As Du Pont notes, "toner or toning as used today was unknown in 19[46] when Law existed." Transcript at 5. Therefore, one would not find the words "toner" or "toning" in the Law patent, but obviously if silicon carbide were being used as a toner is used presently, then no inventive skill would be necessary to go from the teachings of Law patent to the claims of the Fan patent.

11. We note here that the defendant's contention that the difference between a photosoluble upper layer in claims 4 and 8 of the Fan patent and a photohardenable upper layer in the Law

patent render the claims completely obvious under 35 U.S.C. § 103, Defendant's Answering Brief at 43, is predicated on the assumption that the other Fan patent claims are anticipated by the Law patent. Because we have concluded that Polaroid has failed to prove that the Fan patent is anticipated by the Law patent, the assertion that the difference between Claims 4 and 8 in Fan and the claims in Law are obvious does not matter. Even if the difference between photohardenable and photosoluble is obvious, the basic image-reproduction process is different enough so that the claims survive this at-

laroid's motion for partial summary judgment will be denied because it has failed to prove, by clear and convincing evidence, that the Fan patent is invalid. Du Pont has shown a reasonable likelihood of success on the merits because it has met its burden of showing, by a preponderance of the evidence, that Polaroid is unable to succeed on its chosen anticipation invalidity defense to infringement and because Polaroid has admitted that it infringes each of the asserted claims of the Fan patent. Defendant's Answering Brief at 7–8.

Having concluded that Du Pont has met its burden of showing a reasonable likelihood of success on the merits, we now turn to the remaining requirements that Du Pont must satisfy in order for it to receive a preliminary injunction.

■ B. *Irreparable Harm.* If a patent holder makes a clear showing of both validity and infringement, irreparable harm may be presumed. *Roper,* 757 F.2d at 1271; *Smith International v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983). Du Pont has made a clear showing that the Fan patent is valid.[12] Polaroid has chosen to attack the Fan patent on basically one ground: anticipation. *See* Defendant's Answering Brief at 43 (D.I. 33); Transcript at 23 (D.I. 46). Du Pont has successfully refuted Polaroid's assertions of invalidity by making a clear showing that Polaroid will be unsuccessful in proving invalidity on its anticipation invalidity defense, the only defense it chose to present to the Court at this time. In addition, Du Pont, by virtue of Polaroid's admission that it infringes each of the asserted claims in the Fan patent, *supra,* has made a clear showing of infringement. Therefore, we will invoke the presumption of irreparable harm.

■ Of course, the presumption of irreparable harm is rebuttable in the face of clear evidence that no irreparable harm will result if a preliminary injunction is not issued. *Roper,* 757 F.2d at 1272. Polaroid argues that Du Pont will not suffer irreparable harm because Du Pont is not using the Fan patent process commercially, Defendant's Answering Brief at 45, and because Du Pont has waited to seek this relief. *Id.* at 46. We find neither argument to be persuasive.

■ We find that it is consistent with intellectual property law principles that a patent holder need not practice his invention in order to prevent others from practicing what he invented. As the Court of Appeals for the Federal Circuit explained in *Smith International:*

> The very nature of the patent right is the right to exclude others. Once the patentee's rights have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights. The infringer should not be allowed to continue his infringement in the face of such a holding.

718 F.2d at 1581. More recently, in *Johnson & Johnson Consumer Products, Inc. v. Ormco Corp.,* Nos. 87–341, 87–547, slip op. (D.Del. Sept. 29, 1988), this Court addressed whether a preliminary injunction should be granted to a patentee to enjoin a competitor from infringing a patent which the patentee was not itself practicing, but to which it had granted licenses. The Court found that the presumption of irreparable harm was not rebutted simply because the patentee was not practicing its invention. *Id.* Indeed, the Court noted that the infringer's contention that the patentee was not marketing a comparable product, and therefore could not lose market share on the specific product in question, was not as persuasive

---

tack. Because the defendant has not argued that the all of the Fan patent claims are obvious in view of the prior art, despite adequate opportunity to do so, we do not address the overall obviousness argument at this time.

**12.** The Court, of course, does not declare that the Fan patent is valid because that is not one of our proper functions. *Roper,* 757 F.2d at 1270

("A patent is born valid. It remains valid until a challenger proves that it was stillborn or had birth defects, or it no longer viable as an enforceable right."); *Fromson,* 755 F.2d at 1555 n. 1 ("Courts should not declare patents valid.... Patents are born valid and remain so until proven otherwise.").

as the patentee's argument that it was suffering irreparable injury because the infringer was gaining in general market share of related products and because the patentee's reputation might be harmed by the continuing sales of the infringing product. *Id.* We adopt the reasoning in *Smith International* and *Johnson & Johnson* in holding that a patentee need not practice its invention in order either to exclude others from practicing the invention or to obtain preliminary injunctive relief, and that failure to practice an invention does not necessarily rebut the presumption of irreparable harm.

■■■ Polaroid's second argument, that Du Pont's delay in bringing this suit, in that it did not immediately seek to enjoin Polaroid's activities, precludes the finding of irreparable harm is similarly unpersuasive. Although it is true that a significant delay can preclude a determination of irreparable harm, *Hybritech*, 849 F.2d at 1457, it is also true that "a showing of delay does not preclude, *as a matter of law*, a determination of irreparable harm." *Id.* (footnote omitted). Moreover, in this case we find that Du Pont's reasons for delay justify the delay in bringing this suit. This is not a situation where Du Pont sat idly by while Polaroid infringed its patent rights. Du Pont won the interference on the Fan patent in 1983. We find it would have been illogical for Du Pont to file suit before that time. As soon as there was economic reason to take action, when Polaroid acquired the remaining shares of Sage in November of 1985, *see Autoclave Engineers, Inc. v. Duriron Co.*, 190 U.S.P.Q. (BNA) 125, 129–30 (E.D.Pa.1976) (delay until infringement made litigation economically worthwhile was acceptable), Du Pont started to take action.[13] Activity between Du Pont and Polaroid commenced soon thereafter and proceeded quite regularly.[14] Contrary to the defendant's suggestion, we do not find the level of contact to be "extremely sporadic," Transcript at 46, nor do we find that Du Pont "sat on," *id.* at 45, their rights for eight years.

We find that Polaroid has not overcome the presumption of irreparable harm that attaches in cases like the case *sub judice* in which there has been a strong showing of both validity and infringement.

C. *Balance of the Hardships and the Public Interest.* Turning to the last two factors, a balance of the hardships and an examination of the public interest, we find that neither side has extensively briefed these issues. Polaroid's sole argument is that the hardship it would suffer if we were to issue a preliminary injunction, the closing of their facility, outweighs the harm to Du Pont because it is not even practicing the Fan patent. Defendant's Answering Brief at 49. This argument again places undue weight on the fact that Du Pont is not presently practicing the process in the Fan patent. As we have already concluded, a patentee need not practice its invention either to claim irreparable harm or to prevent others from infringing the patent.

Further, this is not a case where the plaintiff alleges amorphous injury. Although it does not commercially use the Fan patent, Du Pont is an industry leader in the color proofing industry based on its Cromalin product line.[15] Du Pont alleges that its Cromalin system is losing market share and profits due to the competition from Polaroid's Spectra products. In fact, Polaroid's President and Chief Executive Officer admitted that between 50 and 60 Du Pont customers have switched to Spectra and that Du Pont will lose between $2 and $3 million in sales to Spectra this year. Tuffile Deposition at 44–47, Appendix to Plaintiff's Reply Brief (D.I. 41A).

13. In 1985 sales of Spectra were only $538,000. Exhibit L, Appendix to Plaintiff's Reply Brief (D.I. 41A). By 1987, Spectra sales had increased to roughly $3 million and Polaroid's President and Chief Executive Officer expected them to reach $6 million in 1988. Tuffile Deposition at 19–20, Appendix to Plaintiff's Reply Brief (D.I. 41A).

14. *See supra* note 5 and accompanying text.

15. Du Pont's Cromalin and Minnesota Manufacturing and Mining Company's ("3M's") Matchprint comprise approximately 90% of the United States color proofing market. Plaintiff's Opening Brief at 4–5 (D.I. 10).

**1146**

Moreover, although the public interest in the graphics arts industry *per se* may be minimal, we find, as the court in *Smith International* found, that the public has an interest in protection of rights found in valid patents. 718 F.2d at 1581. One of the bases of intellectual property law is to give inventors an incentive to practice their talents by allowing them to reap the benefits of their labor. One of these benefits is the right to prevent others from practicing what they have invented. Otherwise, if inventors cannot depend on their patents to exclude others, we fear that research and development budgets in the science and technology based industries would shrink, resulting in the public no longer benefitting from the labors of these talented people. The public interest does not rest with Polaroid.

### III. CONCLUSION

Du Pont has met its burden of demonstrating by a preponderance of the evidence that Polaroid cannot prove by clear and convincing evidence that the Fan patent is invalid based on the arguments presented to the Court to date. Therefore, Polaroid's motion for partial summary judgment will be denied. Because Du Pont has shown that without an injunction it will suffer irreparable injury, that the balance of hardships tips in its favor, and that the public interest favors the issuance of an injunction, Du Pont's motion for a preliminary injunction enjoining Polaroid's infringement of the Fan patent will be granted.

An appropriate order will follow.